KEITH KERR, Indiv. and on Behalf of Those Certain Underwriters at Lloyd's London, *et al.*, Plaintiffs-Appellees, v. ILLINOIS CENTRAL RAILROAD COMPANY, Defendant and Third-Party Plaintiff-Appellant (Bellafonte (U.S.) Insurance Company *et al.*, Third-Party Defendants-Appellees; Harbor Insurance Company *et al.*, Third-Party Defendants).

First District (5th Division) No. 1—95—2701

Opinion filed August 30, 1996.—Rehearing denied October 17, 1996.

Weston W. Marsh, Paul A. Hybel, and Rhiannon E. Schmieg, all of Freeborn & Peters, of Chicago, for appellant.

Don W. Fowler, Terry R. Howell, Jason Brener, and Leslie J. Rosen, all of Lord, Bissell & Brook, Gerard C. Smetana, of Smetana & Avakian, and D.J. Sartorio and Katherine Arnold, both of Tressler, Soderstrom, Maloney & Priess, all of Chicago, and Stuart H. Newberger and Glenn Grant, both of Crowell & Moring, of Washington, D.C., for appellees.

JUSTICE HOURIHANE delivered the opinion of the court:

Plaintiffs, certain underwriters at Lloyd's, London, and certain London Market Insurance Companies (hereafter London Insurers) sought a declaratory judgment that they were not obligated to indemnify defendant, Illinois Central Railroad Company (IC), for amounts IC expended in defense and settlement of an employment discrimination class action suit. IC counterclaimed and filed a third-party action against several other of its insurers. The circuit court found that IC failed to give timely notice to its insurers and granted the London Insurers' motion for summary judgment.

On appeal, IC argues that the circuit court improperly construed the notice provision in the policies and applied its own "reasonable attorney" standard in determining whether IC's notice was timely; that the circuit court improperly drew all inferences in favor of the movants and against IC; and that the circuit court's finding that plaintiffs demonstrated prejudice by the timing of IC's notice is not supported by the record.

We affirm.

## BACKGROUND

### I. The Underlying Litigation

The underlying suit in this insurance coverage dispute involves a claim of racial discrimination lodged by a group of approximately 150 black workers who, in 1979, unsuccessfully sought employment as laborers at IC's St. Louis, Missouri, division. One of the applicants, Robert Mister, filed a charge with the Equal Employment Opportunity Commission, and upon issuance of a right to sue letter in

1981, filed a class action lawsuit against IC in the United States District Court for the Southern District of Illinois alleging discriminatory hiring practices (hereafter the *Mister* case). The complaint sought compensatory damages of $5 million and punitive damages of $10 million in each of three counts.

On February 22, 1982, the district court granted, in part, IC's motion to dismiss. During the pendency of this motion, IC learned that plaintiff intended to seek certification of a much broader class than the original group of job applicants, and on August 6, 1981, Robert Serpe, IC's in-house counsel, prepared a memo that states in relevant part:

> "Recently I have had several opportunities to discuss this case with Dick Boyle and Dick Nash, our local attorneys. Both have expressed great concern, and I feel justifiably so, about this case. The plaintiff's attorney, Jerome S. Schlicter, not only has had special training in the area of civil rights, class action litigation but has successfully prosecuted a number of such cases.
>
> Schlicter's intention is to expand his class beyond the 150 'rejected' applicants which were the original focus of this suit to include a class of past and present employees and applicants in the states of Illinois and Kentucky. We, of course, are resisting his efforts. However, if the plaintiff is successful the verdict potential of this case will easily exceed several million dollars."

On November 3, 1982, the district court certified a class consisting of all black applicants at IC's St. Louis division from 1976 through 1980.

In 1983, IC hired a statistical expert, Dr. David Peterson. During the summer of 1983, Peterson performed a number of analyses of the St. Louis division's hiring records and concluded that, after taking "proximity to the workplace" into account (which IC advised was a factor in its hiring decisions), IC had not discriminated. Peterson advised IC against settling the case for more than the anticipated cost of defending.

In August 1984, Peterson was asked to analyze IC's maximum exposure if plaintiffs prevailed at trial. Two analyses were produced. The first showed a high-end verdict of $870,000; the second showed a maximum potential exposure of approximately $2 million.

On September 14, 1984, following receipt of the first analysis, Jim Garrison wrote a memo to Dick Nash, both of whom were outside litigation counsel on the *Mister* case. The memo states in relevant part:

> "In Professor Peterson's opinion, we should take this worst possible scenario analysis with no more than a few grains of salt.

Based upon his distance from the job site hiring pattern analysis, he believes that we can win this case."

On August 6, 1986, the district court decided in favor of IC, finding that although a *prima facie* case of disparate treatment and disparate impact had been established, IC had successfully rebutted this *prima facie* case by demonstrating that distance from the workplace and its practice of local hiring accounted for the differences indicated by the plaintiffs' analysis of the relevant statistical data. *Mister v. Illinois Central Gulf R.R. Co.*, 639 F. Supp. 1560 (S.D. Ill. 1986).

Plaintiffs appealed, and on October 29, 1987, the Seventh Circuit Court of Appeals reversed the district court's decision, finding that IC's studies did not satisfy the employer's need to articulate a reason unrelated to race sufficient to rebut the plaintiffs' *prima facie* case. The case was remanded to the district court for a determination of damages. *Mister v. Illinois Central Gulf R.R. Co.*, 832 F.2d 1427 (7th Cir. 1987).[1]

Two business days later, on November 3, 1987, approximately six years after the *Mister* suit was first filed in district court, IC gave notice to all its insurers of a potential claim in excess of IC's $1.5 million self-insured retention (SIR). The London Insurers reserved their rights on a number of issues, including late notice. In October 1989, the district court appointed a special master to consider the damages question. In June 1993, after extensive hearings, IC agreed to settle the case for $10 million. IC looked to its insurers for the $10 million settlement, as well as some $3 million in legal fees.

## II. The Coverage Dispute

In 1991, before IC actually settled the *Mister* case, IC made a claim on the policies at issue here based on amounts IC had already expended in defense of the *Mister* suit. In response, the London Insurers filed a declaratory judgment action to determine whether they had a duty to indemnify IC for losses in the *Mister* case. In 1993, after IC settled the litigation, IC filed a counterclaim against the London Insurers and a third-party complaint against several other of its insurers, including Bellafonte (U.S.) Insurance Company (Bellafonte) and California Union Insurance Company (now known as CIGNA Specialty California Union Insurance Company) (CIGNA).

Following extensive document production, but before depositions were taken or interrogatories propounded, the London Insurers moved for summary judgment on their declaratory judgment action

---

[1]IC's subsequent petition for *certiorari* to the United States Supreme Court was denied. 485 U.S. 1035, 99 L. Ed. 2d 911, 108 S. Ct. 1597 (1988).

asserting that IC had provided "unreasonable notice of the underlying claim and thereby breached the notice provisions of the policies." Each policy provides indemnity for IC's ultimate net loss, including attorney fees, in excess of IC's $1.5 million SIR up to $4 million. There is no right under the policies for the insurers to participate in the defense of any claim against IC. The notice provision under these policies reads in pertinent part:

> "The Assureds upon knowledge of any occurrence likely to give rise to a claim hereunder shall undertake to use diligence in giving notice of loss and in presenting proofs to Underwriters and shall give such notice and present such proofs to the Underwriters as soon as practical through Rollins Burdick Hunter & Co. [brokers], who are hereby authorized to instruct Messrs. Lord Bissell & Brook to assess the loss on behalf of the Underwriters ***."

The London Insurers argued in their motion for summary judgment that IC's notice was unreasonable as a matter of law because it was given years after IC knew its liability exposure far exceeded the SIR. They further argued that they were irreparably prejudiced by being deprived of the opportunity to make their own investigation of the case, participate in discovery, suggest additional defenses, or explore settlement prior to a determination of liability.

IC responded to the motion for summary judgment with affidavits from Serpe (in-house counsel), Nash, and Kenneth Halvachs (both outside counsel), essentially stating that the facts of the *Mister* case were favorable to IC and never provided any basis to conclude that this suit was "likely" to give rise to a claim in excess of IC's SIR. Serpe also stated that upon certification of a limited class, his concerns raised in the August 6, 1981, memorandum were eliminated. IC also sought to establish, by way of affidavit from its present counsel, Paul Hybel, that IC's legal fees from the initiation of the litigation up to trial were less than $250,000, and through the seventh circuit appeal legal fees were $500,000. Additionally, IC argued that most of the factors on which the London Insurers relied in their motion for summary judgment (the *ad damnum* in the *Mister* complaint, attorney fees, and damage estimates) speak only to the *amount* of damages and do not address the *probability* that IC would be found liable in the first place.

The circuit court found that IC had failed to give timely notice and granted summary judgment in favor of the London Insurers with respect to those policies providing the first layer of coverage from $1.5 million to $4 million. Upon the oral motions of Bellafonte and CIGNA, summary judgment was also granted as to these two third-party defendants.

IC filed a motion to reconsider and supplemented its earlier filed affidavits with affidavits from Dr. Peterson (IC's expert), Garrison (outside counsel), and Douglas Koman (IC's treasurer). In Peterson's affidavit, he confirmed that, according to his analyses, IC never discriminated and that he had advised IC not to settle for more than defense costs. Garrison's affidavit stated that Peterson's September 1994 analyses were not intended to and did not evaluate the probability of IC being found liable. Finally, Koman's affidavit stated that IC first set a reserve for the *Mister* case in the amount of $400,000 in December 1987 after the decision of the appeals court.

The circuit court, after considering the additional affidavits, denied IC's motion to reconsider. IC appeals the circuit court's decision granting summary judgment in favor of the London Insurers, Bellafonte, and CIGNA. 155 Ill. 2d R. 304(a).

## ANALYSIS

### I

IC's principle argument is that the notice provision at issue here gives it discretion in evaluating its position and determining when a claim under the policies appears "likely." In conjunction with such discretion, IC maintains that the notice provision requires application of a two-step test to determine when the obligation to give notice arises. According to IC, notice is not required unless and until (i) liability appears likely, *i.e.*, probable, *and* (ii) that such liability is likely to exceed IC's SIR of $1.5 million. Thus, IC argues that there must be more than a mere "possibility" that liability in excess of the SIR would be assessed against IC. Consequently, even if IC had knowledge that it was likely that IC would be found liable in the *Mister* litigation, notice would not be required unless and until IC also determined that damages were likely to exceed IC's SIR of $1.5 million. Rather than apply the literal terms of the notice provision, IC argues that the trial court erred by broadly construing the provision in favor of the insurers and applying its own "reasonable attorney" standard.

While we agree with IC that the notice provision here gives it some discretion in determining when a claim under the policies appears likely (see *First State Insurance Co. v. Montgomery Ward & Co.*, 267 Ill. App. 3d 851, 642 N.E.2d 715 (1994); *Atlanta International Insurance Co. v. Checker Taxi Co.*, 214 Ill. App. 3d 440, 574 N.E.2d 22 (1991); *Brownlee v. Western Chain Co.*, 74 Ill. App. 3d 804, 393 N.E.2d 515 (1979)), we find no support in the case law for IC's position that the timeliness of its notice should be determined exclusively by this two-step test.

IC's reliance on *Hartford Accident & Indemnity Co. v. Rush-Presbyterian-St. Luke's Medical Center*, 231 Ill. App. 3d 143, 595 N.E.2d 1311 (1992), to support its position is misplaced. The underlying suit in *Hartford* was a medical malpractice action alleging negligence during childbirth and seeking unspecified damages in excess of the jurisdictional minimum of $15,000. Similar to the notice provision at issue here, notice to the hospital's excess insurer was required "[w]henever it appear[ed] that an occurrence [was] *likely to involve indemnity*" under the policy. (Emphasis omitted and added.) *Hartford*, 231 Ill. App. 3d at 145. The hospital gave notice 20 months after suit was filed.

In the subsequent coverage dispute, the trial court applied the two-step test IC advocates here, finding that the insured was required to give notice when it appeared likely that (1) the insured would be held liable, and (2) liability would exceed $1 million, the trigger for excess coverage. The trial court also noted, however, that "such contingencies would never appear likely to an insured who closed its eyes to the facts and circumstances before it." 231 Ill. App. 3d at 147-48. Applying an objective standard of reasonableness, the trial court reasoned that the hospital was a sophisticated insured and that it should have known immediately upon the filing of the complaint that excess coverage could be implicated. On appeal, this court reversed.

■ We defined the dispositive issue not as whether the hospital would have been "wiser" to notify its insurer earlier, but whether the hospital complied with the letter of the notice provision, which granted the insured some discretion in deciding when it "appears that an occurrence is likely to involve indemnity" under the policy. *Hartford*, 231 Ill. App. 3d at 150. Thus, we held:

> "[W]hen the timeliness of the notice is challenged by an excess insurer and a court is asked to consider whether an insured has complied with the notice provision in an excess policy which leaves the timing of the notice up to the discretion of the insured, the court must determine whether the insured abused the discretion granted to it by the insurer, *i.e.*, whether the insured acted unreasonably under the circumstances." *Hartford*, 231 Ill. App. 3d at 150.

This ruling is consistent with earlier decisions of this court which similarly hold that all facts and circumstances bearing on the reasonableness of late notice are appropriate for consideration. See *Grasso v. Mid-Century Insurance Co.*, 181 Ill. App. 3d 286, 290, 536 N.E.2d 977 (1989). Later pronouncements of this court are also in accord. See *Twin City Fire Insurance Co. v. Old World Trading Co.*, 266 Ill. App. 3d 1, 7, 639 N.E.2d 584 (1993) (time within which notice is

required is determined by a standard of reasonableness based upon the facts and circumstances of a particular case).

Although we acknowledged in *Hartford* that some consideration must be given to the insured's investigation and evaluation of the case in light of the discretion granted the insured by its excess insurer, we did not, as IC now urges us to do, consider the insured's evaluation of the case to the exclusion of all else. Rather, we considered the reasonableness of the notice in light of all the circumstances, including prejudice, if any, to the excess insurer and concluded that the hospital's notice was timely. The facts there demonstrated that prior to giving notice, the hospital lacked sufficient information from which to make an informed decision concerning its potential exposure. Moreover, trial did not take place until several months after notice was given, thus allowing the insurer more than ample time to make its own investigation of the case. *Hartford*, 231 Ill. App. 3d at 152-53. Consequently, the excess insurer was not allowed to escape liability.

We see no reason to depart from the sound rationale set forth in *Hartford* by replacing it with the two-step test we implicitly rejected in that case. The two-step test, while attractive in its simplicity, would render the notice provision in excess policies mere surplusage.[2] An insured who failed to provide otherwise timely notice could conveniently claim that its evaluation showed less than a 50% chance of being found liable, or even where liability was admitted, that there was less than a 50% chance that damages would exceed the excess coverage incept amount. An excess insurer would, in effect, be called on simply to write the check. We cannot accept IC's claim that such results only "*appear* surprising or unreasonable." (Emphasis added.)

■ Notice provisions in insurance policies serve the important function of allowing the insurer the opportunity to make a timely and thorough investigation of the insured's claim. *American States Insurance Co. v. National Cycle, Inc.*, 260 Ill. App. 3d 299, 310-11, 631 N.E.2d 1292 (1994); *Twin City Fire Insurance Co.*, 266 Ill. App. 3d at

---

[2]We previously rejected another simplistic, bright line test for determining the reasonableness of notice which the federal court of appeals applied in *Atlanta International Insurance Co. v. Yellow Cab Co.*, 962 F.2d 657 (7th Cir. 1992). See *Hartford*, 231 Ill. App. 3d at 151-52. We note, however, that even in *Atlanta International Insurance Co. v. Yellow Cab Co.* the court refused to rely solely on the insured's investigation and evaluation of the claim as the appropriate measure of when it "appears likely" that excess coverage will be implicated. *Atlanta International Insurance Co. v. Yellow Cab Co.*, 962 F.2d at 659.

7. Although generally an excess insurer does not reserve the right to participate in the defense of the claim, this is not tantamount to a surrender by the insurer of its right to protect its own interests. This is particularly true where, as here, the notice provision indicates the insurer's intention, upon receipt of notice, to "assess the loss." An excess insurer should not be forced to rely on its insured or the primary insurer to protect its interests where timely notice would provide the excess insurer with an opportunity to pursue its own investigation. See *Highlands Insurance Co. v. Lewis R. Service Co.*, 10 F.3d 1247, 1250 (7th Cir. 1993) (excess insurer could not rely on primary insurer to protect its rights once settlement amount exceeded primary coverage limits). Thus, notice provisions are valid prerequisites to coverage and not mere technical requirements which the insured is free to overlook or ignore with impunity. *American States Insurance Co.*, 260 Ill. App. 3d at 311. Accordingly, the discretion given to IC to determine when a claim is likely under the policy must be considered in light of the London Insurers' right to "assess the loss" arising out of the *Mister* litigation. This is not a novel approach. In construing notice provisions in insurance policies where the reasonableness of the insured's conduct is at issue, courts will weigh the desirability of the insured being compensated for its losses against the importance of notice to the insurer as a means of providing an opportunity for the insurer to investigate the claim and protect its interests. See *American Country Insurance Co. v. Efficient Construction Corp.*, 225 Ill. App. 3d 177, 181, 587 N.E.2d 1073 (1992).

Based on the foregoing, no error was committed by the trial court's failure to apply IC's two-step test or, as IC also asserts, by the court's failure to apply the test correctly. As to whether the trial court made the appropriate inquiry when it ruled on the insurers' motion for summary judgment, we find no merit to IC's claim that the trial court applied its own "reasonable attorney" standard.

Although the trial court did refer at one point to such a standard, a review of the record convinces us that this was nothing more than an inadvertent error in speech. In ruling on the London Insurer's motion for summary judgment, the trial court stated in relevant part:

> "[W]e're dealing here with a provision in the policy that says that a party shall undertake to use diligence in giving notice and shall give such notice as soon as practicable.
>
> And the Court is allowed on a motion for summary judgment in this type of situation to determine this on summary judgment applying a reasonable standard.
>
> And the cases define reasonable standard in different ways. But

essentially the *** main ways they've been talked about is that notice is due when the excess policy is reasonably likely to be implicated, or the court should look at whether the insured acted reasonably in withholding notice."

This language essentially tracks this court's holding in *Hartford*, and we find nothing else in the record suggesting that the trial court was under a misapprehension of the law in this area. Accordingly, we find no error as to the standard of reasonableness applied by the trial court.

## II

We next consider whether summary judgment in favor of the London Insurers was proper. Summary judgment will be granted only where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1994). The function of the trial court is not to decide disputed issues of fact, but rather to determine whether a factual dispute exists. *First State Insurance Co. v. Montgomery Ward & Co.*, 267 Ill. App. 3d 851, 854-55, 642 N.E.2d 715 (1994). On appeal of a grant of summary judgment, this court will conduct a *de novo* review (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992)) and is required to reverse if there is a genuine issue of material fact or an erroneous interpretation of the law. *First State Insurance Co.*, 267 Ill. App. 3d at 855. In determining whether there is a genuine issue of material fact, the record must be construed strictly against the movant and liberally in favor of the opponent. *First State Insurance Co.*, 267 Ill. App. 3d at 855.

■ Where the facts are undisputed, the reasonableness of notice to an insurer by its insured is a question of law. *Twin City Fire Insurance Co.*, 266 Ill. App. 3d at 7; *Hartford*, 231 Ill. App. 3d at 148. Although IC claims that, at a minimum, the various affidavits it submitted in response to the London Insurers' motion for summary judgment and in support of its own motion to reconsider created a triable issue of fact precluding summary judgment, our review of the record does not support this conclusion. We note that there is no factual dispute as to the history of the *Mister* litigation or the information that was available to IC relative to the verdict potential in the case, nor is there any factual dispute about the policy language or when notice was actually given. Accordingly, the reasonableness of IC's notice to its excess insurer is a question of law. Consistent with our ruling in *Hartford*, we determine the timeliness of IC's notice by considering whether, under all the circumstances, including

any prejudice to the London Insurers, IC acted reasonably or whether it abused the discretion granted to it.

The trial court identified several events during the six years prior to IC giving notice which the court stated would have triggered the obligation to give notice, *i.e.*, events which would have led a reasonable person to believe that the excess coverage was likely to be implicated. The latest such trigger event identified by the court was the 1984 report generated by IC's expert, which set IC's maximum exposure in the *Mister* case at $2 million. The trial court also found that the insurers had been prejudiced by IC's failure to give notice until IC's liability had already been decided on appeal. We agree.

The undisputed facts reveal that, from the outset, IC viewed this litigation with a significant degree of concern. In Serpe's August 6, 1981, memo, IC recognized the experience and past success of plaintiffs' counsel in civil rights litigation and that the verdict potential, should a broad plaintiffs' class be certified, would "easily exceed several million dollars." The class which was ultimately certified in 1982 consisted of all black applicants at IC's St. Louis division from 1976 through 1980. This class is substantially broader than the original group of rejected applicants.

We note also that the *ad damnum* in the complaint sought damages of $5 million and punitive damages of $10 million in each of three counts. While the *ad damnum* is not dispositive of the issue of timeliness of notice, neither is it irrelevant to our determination. The damages plaintiffs initially sought do not appear grossly inflated, particularly in light of the broad class that was certified, and the settlement ultimately reached in the case. See *First State Bank*, 267 Ill. App. 3d at 856 ($3.275 million *ad damnum* not patently absurd considering severity of injuries and jury verdict of $2 million, and although not dispositive, *ad damnum* relevant to reasonableness of notice); *Brownlee*, 74 Ill. App. 3d at 812 (summons which failed to disclose *ad damnum* insufficient to raise specter of excess liability). Further, as the trial court observed, 18 months before trial, IC's own expert set the verdict potential at $2 million. Significantly, this figure did not include prejudgment interest or attorney fees.

We also consider whether the excess insurers were prejudiced by the delay. Prejudice to the insurer is a factor to consider in determining the reasonableness of notice. *Hartford*, 231 Ill. App. 3d at 151; *Atlanta International Insurance Co.*, 214 Ill. App. 3d at 445. If an insured can show prejudice, it is more likely that the notice it received was not reasonable. *American States Insurance Co.*, 260 Ill. App. 3d at 311. However, an insurer need not prove that it was prejudiced in order to be relieved of the duty to indemnify. *Twin City*

*Fire Insurance Co.*, 266 Ill. App. 3d at 8. Whether prejudice occurred is usually a question of fact for the jury, but it may be decided on a motion for summary judgment if there is no factual basis from which the jury could conclude otherwise. See *American States Insurance Co.*, 260 Ill. App. 3d at 310.

As already noted, the purpose of a notice requirement in an insurance policy is to enable the insurer to conduct a timely and thorough investigation of the insured's claim. *American States Insurance Co.*, 260 Ill. App. 3d at 310-11. The notice provision here provides that notice is given in connection with the insurer's right to "assess the loss." The London Insurers, however, were deprived of any opportunity, however brief, to assess the loss, since notice was not given until liability had already been conclusively determined on appeal. It is remarkable that IC failed to give notice even after plaintiffs in the *Mister* case appealed the decision of the district court, in light of the fact that plaintiffs had established a *prima facie* case of discrimination. The London Insurers were also deprived of any opportunity to encourage settlement. See *First State Insurance Co.*, 267 Ill. App. 3d at 856. Earlier settlement in this case would likely have reduced the prejudgment interest, which accounted for $7.2 million of the $10 million settlement.

We disagree with IC that in order to demonstrate prejudice the excess insurers "should be required to show what 'vital' pretrial motions, discovery, expert analyses and pretrial settlements [IC] failed to pursue that would have made a difference" in the outcome of the litigation. Rather, it is enough here that the excess insurers were denied *any* opportunity to assess the loss and thereby protect their interests. We note that this is not a case where the excess insurers received notice in advance of trial and yet claim prejudice. Here, the excess insurers did not receive notice until after trial *and* appeal.

Even if the London Insurers did not demonstrate actual prejudice, a lack of prejudice is not determinative of whether IC acted reasonably by withholding notice until the court of appeals determined liability. *Twin City Fire Insurance Co.*, 266 Ill. App. 3d at 7; *American Mutual Liability Insurance Co. v. Beatrice Cos.*, 924 F. Supp. 861, 877 (N.D. Ill. 1996). Compliance with the notice provision is a condition precedent to coverage and, if breached, the insurer will not be liable under the policy, even if there was no showing in fact of prejudice. *Brownlee*, 74 Ill. App. 3d at 810, quoting with approval *Greyhound Corp. v. Excess Insurance Co. of America*, 233 F.2d 630 (5th Cir. 1956).

We also cannot accept IC's claim that the excess insurers here accepted the risk of any prejudice that resulted during the period prior to IC giving notice. Although the notice provision granted IC *some*

discretion in determining when a claim appeared likely, the provision did not grant IC *unfettered* discretion. An insured cannot simply roll the dice with the insurer's funds, hiding behind the statistical probabilities it has assigned to the case outcome. We observe, too, that the burden to an insured to give notice is slight, whereas the repercussions felt by an insurer due to late notice can be substantial, as they are in this case. Based on the information available to it, and bearing in mind the purpose of notice provisions in insurance policies, we conclude that IC abused the discretion afforded it under the excess policies.

We are not persuaded by IC's argument that consideration of its "subjective knowledge" would somehow change the outcome. Plainly, consideration of the facts and circumstances surrounding the *Mister* litigation includes consideration of the subjective knowledge of IC's litigation team and none of the facts considered here was outside the scope of such knowledge. However, IC's subjective beliefs and conclusions based on those facts are not dispositive of the issue of whether notice was timely. If that was the case, an insured could turn a blind eye to the facts and justify late notice by merely asserting that it never believed that the excess coverage would be implicated. Plainly, an insured's subjective beliefs must give way to an objective standard of reasonableness based on all the circumstances. Accordingly, we find as a matter of law that it was unreasonable for IC to withhold notice for over six years while the case was fully litigated and appealed and the only remaining issue was the amount of damages to be awarded.

Having determined that the trial court's grant of summary judgment in favor of the excess insurers was proper, we need not consider IC's further arguments that the trial court erred by disregarding certain affidavits and by improperly drawing all inferences in favor of the insurers. In any event, neither argument finds support in the record.

For the foregoing reasons, the order of the circuit court granting summary judgment in favor of the London Insurers, Bellafonte, and CIGNA is affirmed.

Affirmed.

GORDON and COUSINS, JJ., concur.