KEARSE, Circuit Judge,
dissenting:
I respectfully dissent from the majority’s decision to affirm the district court’s grant of summary judgment dismissing this action brought by plaintiff Lumbermens Mutual Casualty Company (“Lumbermens”) seeking a declaratory judgment that defendants RGIS Inventory Special *54 ists, LLC., et al. (collectively “RGIS”), were not entitled to coverage under their excess insurance policy with Lumbermens for “Commercial Catastrophe Liability Coverage” (the “Policy”), which was to provide up to $25 million coverage if the $2 million coverage provided in RGIS’s primary insurance policy were exhausted. Lumbermens contended that with respect to an April 8, 2003 catastrophic traffic accident — in which a vehicle driven by an RGIS employee struck pedestrian Robert Shore, leaving Shore brain damaged and unable to walk, talk, or use the right side of his body — and a February 10, 2005 lawsuit on behalf of Shore based on that accident, RGIS’s notice to Lumbermens on January 14, 2008 was not timely. I have several difficulties with the majority’s analysis of the relevant Policy provisions and its conclusion that RGIS’s notice, given nearly five years after the accident and literally on the eve of trial, was timely.
The Policy, which made timely notice a precondition to Lumbermens’s duty to provide RGIS with excess coverage, provided, in pertinent part, as follows:
a. You must see to it that we are notified as soon as practicable of an “occurrence” ... whenever it appears likely it will result in a claim involving this Coverage Part....
Notice of an “occurrence” ... is not notice of a claim.
b. If a claim is made or “suit” is brought against any insured, you must
2) Notify us as soon as practicable. You must see to it that we receive written notice of the claim or “suit” as soon as practicable whenever it appears likely that such claim or “suit” will involve this Coverage Part.
(Emphases added.) The Policy also provided that RGIS “must ... [c]ooperate with [Lumbermens] and with the underlying insurer in the investigation or settlement of any [such] claim.”
The majority holds that these terms did not require RGIS to notify Lumbermens of the accident because RGIS believed — ■ based principally on (a) the opinions of the police officer who had witnessed the accident that RGIS’s driver had been driving safely and was not negligent, and (b) Connecticut principles of comparative negligence — that it would not be found liable for Shore’s injuries. The majority reaches its conclusion principally by emphasizing the word “will,” stating that “the policy only requires notice when it ‘appears likely’ that a claim ‘will’ involve excess coverage,” Majority Opinion ante at 52, and stating that “at no point prior to trial did anyone (other than [Shore’s] counsel) indicate that a finding of liability was ‘likely1 or ‘more probable than not,’ ” id. at 53 (emphasis added); see also id. (stating that RGIS’s belief that it would “prevail! ]” “directly b[ore] on whether it appeared ‘likely’ that Shore’s claim would reach the Excess policy” (emphases added)).
In my view, the majority’s rationale both ignores the normal breadth of the word “involve[s]” and confuses the concepts of claim and liability. The Policy does not say that notice is to be given when it appears likely that the insured will be “liable” for an amount involving the excess coverage. Rather, it requires notice when it appears likely that an occurrence “will result in a claim involving” the excess coverage, and requires notice when a claim is made or a suit is brought and it appears likely that “such claim or ‘suit’ will involve ” the excess coverage (emphases added). In my view, where the claimed damages “do not appear grossly inflated,” Kerr v. Illinois Central R.R. Co., 283 Ill.App.3d *55 574, 584, 219 Ill.Dec. 81, 670 N.E.2d 759, 767 (1996) (“Kerf ’) (applying Illinois law); see Royal Property Group, LLC v. Prime Insurance Syndicate, Inc., 267 Mich.App. 708, 714 n. 5, 706 N.W.2d 426, 432 n. 5 (2005) (“Illinois rules of insurance policy interpretation are substantially similar to those of Michigan”), a claim or a suit seeking more than $2 million “involve[s]” more than $2 million.
The majority points out that the “whenever it appears likely” language confers on the insured “some discretion” in evaluating the case, see Majority Opinion ante at 52 n. 4. I agree, although to me that cannot be the end of the analysis. See Aetna Casualty & Surety Co., v. Dow Chemical Co., 10 F.Supp.2d 800, 809 (E.D.Mich.1998) (“Aetna”) (a requirement for notice when the insured “ ‘had information or had formed an opinion at a particular time that a claim would implicate’ the policy” is “rubbery language ... designed to give the insured some leeway or discretion in forming a judgment about when ... protection is implicated” (quoting policy language; other internal quotation marks omitted) (emphasis added)). Plainly, “some” discretion does not mean total or unfettered discretion.
[Wjhen the timeliness of the notice is challenged by an excess insurer and a court is asked to consider whether an insured has complied with the notice provision in an excess policy which leaves the timing of the notice up to the discretion of the insured, the court must determine whether the insured abused the discretion granted to it by the insurer, i.e., whether the insured acted unreasonably under the circumstances.
Kerr, 283 Ill.App.3d at 580, 219 IlLDec. 81, 670 N.E.2d at 764 (emphasis added) (internal quotation marks omitted) (considering a provision requiring notice when it “appears that an occurrence is likely to involve indemnity”) (emphasis in original). “Although ... some consideration must be given to the insured’s investigation and evaluation of the case in light of the discretion granted the insured by its excess insurer,” the court should “not ... consider the insured’s evaluation of the case to the exclusion of all else,” rather than “in light of all the circumstances.” Id. at 581, 219 IlLDec. 81, 670 N.E.2d at 764-65 (emphasis added). “An insured cannot simply roll the dice with the insurer’s funds, hiding behind the statistical probabilities it has assigned to the case outcome.” Id. at 586, 219 IlLDec. 81, 670 N.E.2d at 768.
I do not read the cases applying Michigan law and interpreting notice clauses similar to those at issue here to indicate that whether a claim or a suit “involve[s],” or “implicate[s],” an excess insurance policy depends upon whether or not the insured believes it will ultimately be found liable. In Aetna, for example, the court considered an excess policy that required the insured to “give notice when it has ‘knowledge of any occurrence likely to give rise to a claim hereunder,’ ” 10 F.Supp.2d at 807, language that the court found “substantially similar” to policy language requiring the insured “to give notice when it ‘has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable, is likely to involve this Policy.’ ” Id. (emphasis added; original emphases omitted). Some focus must be on the magnitude of the claim; the focus cannot reasonably be solely on the likelihood of a finding of liability. “ ‘Excess insurers are not interested in every accident,’ ” but they are interested “ ‘in those that may be serious enough to involve [them].’ ” Santos v. Farmers Insurance Exchange, No. 07-11229, 2008 WL 506351, at *4 (E.D.Mich.2008) (applying Michigan law; quoting Tribune Co. v. All *56 state Ins. Co., 306 Ill.App.3d 779, 790, 239 Ill.Dec. 818, 715 N.E.2d 263, 271-72 (1999), which was applying Illinois law).
In this case, it was plain from the outset that the accident was serious enough to result in a claim of more than $2 million, the limit of RGIS’s primary insurance. The police report of the accident noted that Shore had sustained two broken legs, possible internal injuries, and possible brain damage. Shore’s complaint, filed in February 2005, alleged that Shore had suffered “serious and painful injuries, some of which may be permanent,” including “injuries to his neck,” “injuries to his back,” and “severe and massive head trauma resulting in a comatose state and prolonged unconsciousness.” The law firm retained to defend Shore’s lawsuit (“Celia”) prepared a litigation report for RGIS in May 2007 (the “Celia report”) which noted that Shore’s economic-injury expert “estimate[d] Mr. Shore’s total life care cost at an estimated $3,706,132.00” and that although RGIS had not retained an expert, Celia was “certain that any life care plan will provide estimates in the millions of dollars range.” Moreover, noting that Shore “cannot walk or talk any longer,” that “[h]e requires constant care for all [activities of daily life],” that “his loss of life’s enjoyment is significant,” and that “a jury will consider how painful the actual incident was, as well as the pain of rehabilitation and his current disability,” the Celia report “estimate[d] that Mr. Shore’s non-economic damages [we]re at least equal to his economic damages in terms of settlement and jury value.” (Emphasis added.) Thus, Shore’s damages as estimated by the Celia report totaled more than $7,400,000. Even if Shore were found as much as 50% responsible for the accident, he would be entitled to recover more than $3,700,000 — ie., nearly twice the coverage provided by RGIS’s primary insurer. The Celia report concluded that, “given the risk, no matter how slight, of a substantial damages award, there is considerable value to settling this claim short of trial.”
At the ensuing mediation session in June 2007, the Celia report’s damages estimate proved not far off. Shore’s attorneys initially demanded $9.5 million, and by the end of the session had lowered their demand to $7.5 million. On the following day, RGIS was informed by one of its advisors who had attended the session that he thought the case could be settled for “$4M-$5M.” There was no settlement, however. The insureds and their primary carrier never offered Shore more than $100,000. At the trial, which commenced on January 15, 2008, one day after RGIS finally notified Lumbermens of the suit, the jury found RGIS 100% responsible and awarded Shore more than $11.1 million.
Despite the pretrial predictions of RGIS’s advisors that RGIS would not ultimately be found liable, there had been observations in the Celia report that suggested a more cautious assessment. For example, although the predictions drew heavily on the opinion of Police Officer Quicquaro, who had witnessed the accident and believed that RGIS’s driver was not at fault, the Celia report stated that “many of the conclusions and opinions that Officer Quicquaro reached will not likely be admissible at trial” because Celia did “not believe Officer Quicquaro will be qualified as an expert witness and because many of the conclusions reached by Officer Quicquaro are the ultimate issues that will be before the jury.” Further, although the RGIS employee who was involved in the accident had testified in his deposition that he was traveling no faster than 30 miles per hour when he struck Shore, the Celia report noted that
*57 there are several entries in the plaintiffs medical records that the car, which struck Mr. Shore, was traveling at, or about, 40 miles per hour.... The records also indicate at several locations that the plaintiff was thrown some 40 to 50 feet upon impact.
While the Celia report indicated the belief that those records would not be admissible in Shore’s case-in-chief, it stated that “they may come into evidence on cross examination to undermine Officer Quicquaro on his estimate that the defendant was driving reasonably.” In addition, RGIS’s driver had told the police he had no time to react to the appearance of Shore; but according to the Celia report, the accident occurred halfway down a hill. And at whatever speed the RGIS driver was actually traveling, it seems clear that he did not apply his brakes before striking Shore, as the Celia report noted that “there [we]re no skid marks.”
These are not just factors that should be considered in determining whether RGIS abused its discretion in declining to give Lumbermens notice of Shore’s claim; they also are pertinent to whether Lumbermens was prejudiced by RGIS’s failure to give it notice in time to assess the litigation risk and participate in the settlement discussions. Although the majority views it as unnecessary to address the question of whether Lumbermens was prejudiced by the lack of notice, “prejudice to the rights of the insurer is a necessary element to be considered in determining whether there has been an unreasonable delay in giving notice of an accident to the insurer ‘as soon as practicable.’ ” Weller v. Cummins, 330 Mich. 286, 292-93, 47 N.W.2d 612, 615 (1951); see, e.g., Wehner v. Foster, 331 Mich. 113, 117, 49 N.W.2d 87, 89 (1951) (same); Sudul v. Coregis Insurance Co., No. 214715, 2001 WL 633698, at *4 (Mich. App.2001) (considering whether an excess insurer was prejudiced before concluding that it had “received the requisite notice”); Kerr, 283 Ill.App.3d at 584, 219 Ill.Dec. 81, 670 N.E.2d at 767 (“Prejudice to the insurer is a factor to consider in determining the reasonableness of notice.”).
The district court rejected as “speculati[ve]” the contention that the delayed notice prejudiced Lumbermens by depriving it of the opportunity to participate in the settlement discussions. It is clear, however, that there were settlement negotiations from which Lumbermens was excluded. It is also clear that the Policy required RGIS to cooperate with Lumbermens and the primary insurer in “settlement of any claim,” that the Celia report had recommended settling Shore’s claim rather than going to trial, and that after the mediation session an advisor opined to RGIS that the matter might be settled for as little as $4 million. As RGIS’s primary policy ceiling was $2 million, and Shore’s damages were estimated even by RGIS’s attorneys as exceeding $7,400,000, Lumbermens surely would have had an incentive to attempt to secure a settlement. A “late notice [that] prevented the insurers from participating in settlement negotiations” may constitute prejudice, Associated Indemnity Corp. v. Dow Chemical Co., 248 F.Supp.2d 629, 650-51 (E.D.Mich.2003) (granting summary judgment to the excess insurer on the basis of untimely notice), and in the circumstances of the present case, I do not see how Lumbermens’s claim of prejudice can properly be rejected as a matter of law.
The majority opinion, in disagreeing with this dissent, notes that the Aetna court, dealing with a policy requirement for notice of any claim that was likely to involve the policy “ ‘in the event that the Assured should be held liable,’ ” Aetna, 10 F.Supp.2d at 807, “concluded that an occurrence would be ‘likely to involve’ the *58 excess policy only in those instances where the insured reasonably concluded that the primary policy would be exhausted.” Majority Opinion ante at 52. I have two responses. First, the policy clause “ ‘in the event that the Assured should be held liable’ ” (emphasis mine), focuses the notice requirement principally on the amount of the claim and not on the likelihood of a finding of liability; that clause is not the equivalent of a condition that the insured be likely to be held liable. Second, whatever the focus of that clause, it is clear that, unlike the district court here, the Aetna court did not grant summary judgment — or any other form of judgment as a matter of law — against the insurers.
For the above reasons, I would vacate the judgment of the district court and remand the matter for trial.