No. 1-99-0601

MONTGOMERY WARD AND COMPANY, ) Appeal from the

INCORPORATED, AND STANDARD T ) 
Circuit
 Court of

CHEMICAL COMPANY, INC.,          ) County 
Cook

      )

Plaintiffs-Appellants, )

)

          v.   )

)

THE HOME INSURANCE COMPANY, )

IMPERIAL CASUALTY AND INDEMNITY )

COMPANY AND CENTURY INDEMNITY )

COMPANY, as Successor to CCI )

Insurance Company, as Successor to )

Indemnity Insurance Company of )

North America, ) 
Honorable

) 
Dorothy Kirie Kinnaird
,

     Defendants-Appellees. ) 
Judge Presiding.

JUSTICE REID delivered the opinion of the court:

     Plaintiff 
Montgomery Ward & Company, Inc. (Ward),
 appeals 
from the trial court's grant of summary judgment in favor of Imperial Casualty and Indemnity Company (Imperial) and Century Indemnity Company (Century).  The central issue considered by the trial court was
 whether there was insurance coverage for Ward's liability for pollution at a Superfund site in Griffith, Indiana, known as the American Chemical Services, Inc. 
(ACS),
 site.  The trial court granted the insurance companies' motion for summary judgment, finding that Ward gave the defendant insurance companies late notice of an occurrence and therefore had no right to obtain coverage for the pollution claim asserted against it.  The
 issues considered on appeal are: (1) whether the notice of occurrence clauses in the Imperial and Century insurance policies were satisfied; (2) whether the insurance companies have to show they were prejudiced because of Ward's late notice in order to avoid indemnifying Ward; (3) whether Imperial and Century are estopped from relying upon the late notice defense
; (4) whether late notice was waived due to the insurance companies' failure to inform Ward of their intention to rely on a late notice defense
; and (5) whether the mend the hold doctrine applies.
  For the reasons that follow, we affirm in part and reverse in part.

BACKGROUND

     Ward owned two subsidiaries, Standard T Chemicals, Inc. 
(Standard),
 and Montgomery Ward Paint (Ward Paint), both of which manufactured paint.  The process of manufacturing paint produces hazardous waste, which Standard and Ward Paint shipped off-site to recycling centers.  One of the sites they sent their waste products to was American Chemical Services, Inc. 
(ACS),
 which is located in Griffith, Indiana.

     From 1956 through 1983 Ward Paint and Standard shipped wastes for reclamation to the solvent recovery facility operated by ACS.  The United States Environmental Protection Agency (EPA) identified the ACS site as a hazardous waste site in need of remediation, in 1984, by placing it on the National Priorities List, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. §9601 
et
 
seq.
 (1994)).

     On February 21, 1986, Standard received a letter from the EPA which stated that Standard was a 
"Potentially Responsible Party" (PRP)
 for the contamination and remediation of the ACS site.  Standard informed Ward of its communication with the EPA.  Judith Lipson, Ward's general attorney, informed the EPA that Standard was willing to cooperate with the EPA and the other PRPs in negotiating a resolution.  Lipson also requested that the EPA send all further correspondence concerning the matter to Ward's legal department.  

     On February 24, 1986, ACS sent Ward a letter confirming that a portion of the ACS site had been listed as a Superfund site under CERCLA due to on-site disposal from 
1955 to 1975.
  ACS also stated that it believed the EPA incorrectly identified PRPs.  ACS informed Ward that on-site disposal at the site ceased in 1975 and that ACS supplied the EPA with the names of the approximately 200 customers who sent materials to the site during the disposal period.  ACS claimed the EPA developed the list of PRPs from ACS's 1982 and 1983 annual waste generator reports, which contained companies that did not do business with ACS during the period of on-site disposal.

     On March 11, 1986, Standard received a letter from the EPA requesting that Standard attend a meeting of PRPs on May 5, 1986, in Chicago.  
The EPA also sent Ward a request for copies of Standard's shipping activities at the ACS site during the relevant time period.  In a letter dated March 31, 1986, Lipson informed the EPA that the only documents located were for shipments Standard made from 1978 to 1983.

     On April 18, 1986, Ward received a letter from the EPA which informed Ward that it was also a PRP at the ACS because of the activities of Ward Paint.  Lipson responded, informing the EPA that Ward Paint merged with Standard in 1963 and that Ward was willing to cooperate to negotiate a resolution to the matter.  On May 5, 1986, 
Lipson attended the PRP meeting 
as a representative of Ward and Standard.

     At the meeting,
 the PRPs agreed to retain an environmental consultant, Clean Sites, Inc., to analyze ACS's records in order to determine the volume of waste each PRP sent to the site so that the PRPs could agree upon an allocation scheme.  The EPA also agreed to modify the PRP list to only include pre-1975 ACS customers and delete the post-1975 ACS customers who were mistakenly included as PRPs.

     On September 25, 1986, Lipson received a letter from Harvey Sheldon, an attorney who represented other PRPs, informing her that he received an unofficial list of PRPs from Clean Sites and that Ward and Standard were listed.  Sheldon stated that Standard was shown has having 214 solvent shipments and 38 other transactions at the ACS site, and Ward Paint was shown as having 62 shipments and 4 other transactions.  Sheldon stated that Ward and Standard represented a significant share in any allocation and went on to categorize their shipments as one of the larger shares by number of transactions, as opposed to the other PRPs.  Sheldon suggested that Ward become actively involved with a steering committee which was formed by other PRPs because the ACS "site and its remedy appear to be complicated and expensive."

    On October 16, 1986, Lipson advised Ward's general counsel, Spencer Heine, and 
Standard's president or chief executive officer
, Stu Hodes, that Clean Sites had yet to determine the volume of waste involved with each transaction but commented that "the ACS site is large, complex and potentially very costly to clean up."

     On January 30, 1987, Phil Delk, Lipson's supervisor, a Ward attorney, learned at another PRP meeting that an engineering consultant hired by the steering committee estimated cost to remediate the ACS site at potentially $30 million.  Delk stated that Standard's percent of the total pre-1976 generation of hazardous waste volume was over 4%, and he estimated the potential cost to Standard to range from $1.8 to $2 million.  The consultant also estimated that the ongoing investigative process could cost $600,000 to $900,000.  Delk believed the investigation was more likely to cost $800,000 to $1 million.  Delk relayed this information to Lipson and Heine in a letter dated July 2, 1987.

     On February 23, 1987, Lipson attended a meeting for PRPs who planned to participate on the steering committee.  Lipson thereafter participated in steering committee activities, including the ACS allocation subcommittee.  Ward attorney Delk, served as co-treasurer of the ACS administrative fund.  On March 25, 1987, the EPA sent Ward its revised list of PRPs which stated that Standard was a PRP.  Thereafter, Ward continued to attend meetings and actively participated in the investigation and attempt to resolve the matter along with the other PRPs.  

     On July 31, 1987, Delk sent a letter to Ward's corporate insurance department notifying it for the first time of the ACS site and requesting that it put Ward's excess insurance carriers on notice of the claim by the EPA.  
Century Indemnity Company
 (Century) and Imperial Casualty and Indemnity Company
 (Imperial) provided first-layer excess liability insurance to Ward that commenced immediately above Ward's self-insured retentions (SIR).  Century's policy sat above a $50,000 SIR, and the Imperial policy sat above a $250,000 SIR.  Century provided annual policies to Ward from prior to 1956 to May 1, 1966.  Imperial provided coverage to Ward from May 1, 1975, to May 1, 1976.

     On September 8, 1987, Ward's insurance department sent a letter with the March 25, 1987, EPA letter to its insurance broker, Marsh & McLennan (Marsh), with instructions to notify the appropriate insurers of the claim.  On November 4, 1987, Marsh sent notice letters to the insurance companies about the ACS site.  
Marsh included the insurance department memorandum and the March 25, 1987, EPA letter with the notice letter.

     On April 13, 1988, Century responded to Ward's notice letter.  Century informed Ward that it was searching for copies of two of the three policies which were identified in the notice letter and reserved its rights under the three policies in question.  Century also requested that Ward provide information about Ward's involvement at the ACS site as part of Century's investigation of the potential claim.  Imperial did not respond to Ward's notice letter.

     On April 4, 1995, Ward filed suit against Century, and seven other insurance companies, seeking a determination of coverage for eight different sites, including the ACS site.  On September 27, 1996, Ward filed an amended complaint in which Century and Imperial were both named with three other insurance companies.

  
   On May 18, 1995, Century asserted a late notice defense in its response to Ward's complaint, and on October 30, 1996, Imperial also asserted a late notice defense in its response to Ward's coverage claim.
  On September 28, 1998, Century and Imperial by joinder filed their motion for summary judgment based on late notice.  
On December 17, 1998, 
the trial court granted Century and Imperial's motion for summary judgment
 on the basis of late notice.

ANALYSIS

I

     Ward contends the trial court erred in granting summary judgment when it held that Ward gave late notice to Century and Imperial.  Since this appeal arises from an order granting summary judgment, the standard of review is 
de
 
novo
.  
Aetna Casualty & Surety Co. v. Allsteel, Inc.
, 304 Ill. App. 3d 34, 39, 709 N.E.2d 680, 684 (1999).  Summary judgment is properly entered when the pleadings, depositions, admissions and affidavits, viewed in a light most favorable to the nonmovant, fail to establish a genuine issue of material fact, thereby entitling the moving party to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 1998); 
Aetna Casualty
, 304 Ill. App. 3d at 39, 709 N.E.2d at 684.

     Ward contends the trial court improperly interpreted the notice requirements of the Century policy.  Ward specifically argues that the trial court ignored language in the Century policy which required Ward to notify Century of a claim only after Ward's corporate insurance department was notified of a possible claim.  We agree.

     The  conditions inserted into insurance policies are to be construed most favorably to the insured.  
Hartford Accident & Indemnity Co. v. Rush-Presbyterian-St. Luke's Medical Center
, 231 Ill. App. 3d 143, 149, 595 N.E.2d 1311, 1315 (1992).  Although ambiguities in an insurance policy will be construed against the insurer, courts will not distort the language of a policy to create an ambiguity where none exists.  
Dixon Distributing Co. v. Hanover Insurance Co.
, 161 Ill. 2d 433, 441, 641 N.E.2d 395, 399 (1994).

     The language in the Century policy concerning notice provides:

"Upon the happening of an occurrence or accident that appears reasonably likely to involve liability on the part of the company, written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as possible after the accident has been brought to the notice of the insurance department of the insured at its head office in Chicago."

Century contends that to allow Ward to hide behind the literal terms of the notice provision would encourage insureds to purposely keep the designated department uninformed so as to defeat insurance carrier defenses to coverage.  First, we note that Century easily could have refused to have included this type of notice requirement in the policy.  Insurance carriers are certainly sophisticated enough and wield sufficient bargaining power to protect their interests, and Century cannot claim that the notice provision in issue was forced on it by Ward.

     On July 31, 1987, Ward's corporate insurance department was notified of the ACS site by a memorandum from the corporate law department.  Ward's insurance department then sent a letter on September 8, 1987, to the insurance broker, Marsh & McLennan, notifying it of the potential liability under the Century policy due to the possible costs to clean up the ACS site.  This was timely notice according to the notice provision in the Century policy. 

     However, the notice requirements of the Imperial policy are different than those of the Century policy.  The notice clause of the Imperial policy provides that:

"Upon the happening of an occurrence reasonably likely to involve the company hereunder, written notice shall be given as soon as practicable to the company ***." 

     A notice provision is a valid condition precedent and not a mere technical requirement that the insured is free to overlook or ignore with impunity.  
Cincinnati Insurance Co. v. Baur's Opera House, Inc.
, 296 Ill. App. 3d 1011, 1015, 694 N.E.2d 593, 596 (1998).  Where the facts are undisputed, the reasonableness of notice to an insurer by its insured is a question of law.  
Kerr v. Illinois Central R.R. Co.
, 283 Ill. App. 3d 574, 583, 670 N.E.2d 759, 766 (1996).  

     Ward argues that there is a question as to what it knew about its liability at the ACS site prior to July 31, 1987, which presents disputed issues of material fact that preclude summary judgment.  Our review of the record does not support this conclusion.  There is no factual dispute as to the history of when Ward was informed of its potential liability stemming from the cleanup of the ACS site, nor about the Imperial policy language or when notice was given to Imperial.  Accordingly, the reasonableness of Ward's notice is a question of law.

     Here, Ward failed to satisfy the notice requirements under the Imperial policy.  The record shows that as early as September 25, 1986, Ward's senior attorney, Judith Lipson, received information from the environmental consultant, Clean Sites, that Standard and Ward Paint were responsible for 318 transactions at the ACS.  Clean Sites categorized Ward as having a "significant share in any allocation."  Ward was informed that it was one of the larger contributors of waste and was aware that the cost of the cleanup would be expensive.

     On January 30, 1987, Ward attorney Delk learned that the estimated cost to remediate the ACS was potentially $30 million.  Delk stated that Standard's percent of the total pre-1976 generation of hazardous waste volume was over 4%, and he estimated the potential cost to Standard to range from $1.8 to $2 million.   Delk also believed the cost to continue and finish the PRPs' investigation was likely to cost $800,000 to $1 million.  Ward waited for approximately a year or in the alternative approximately eight months after receiving information that its liability for the cleanup at the ACS site would likely exceed the $250,000 SIR on the Imperial policy.  

     Under Illinois law, a delay of even a few months in giving notice breaches the policy as a matter of law, defeats coverage, and justifies the entry of summary judgment for the insurance company.  
Equity General Insurance Co. v. Patis
, 119 Ill. App. 3d 232, 237, 456 N.E.2d 348, 352 (1983); 
Illinois Valley Minerals Corp. v. Royal-Globe Insurance Co.
, 70 Ill. App. 3d 296, 300, 388 N.E.2d 253, 256 (1979).  Ward's eight-month or year-long delay in giving notice to Imperial constitutes late notice.  

II  

     Ward asserts that Imperial must show that it was prejudiced because of the delay in notification in order to avoid indemnifying Ward.  In support of its position that the insurer must show prejudice, Ward cites 
Rice v. AAA Aerostar, Inc.
, 294 Ill. App. 3d 801, 690 N.E.2d 1067 (1998), and  
Baur's Opera House
, 296 Ill. App. 3d 1011, 694 N.E.2d 593.  The cases on which plaintiff relies are distinguishable.  

     In both 
AAA Aerostar
 and 
Baur's Opera House
, the courts were faced with situations where the insurer was not notified of a lawsuit.  In contrast, the case at bar concerns a notice-of- occurrence situation.  The court in 
AAA Aerostar
, in commenting on the uncertainty of whether prejudice to the insurer must be shown before it is relieved of its duty to indemnify, clearly made a distinction between notice-of-occurrence cases and notice- of-lawsuit cases.  
AAA Aerostar
, 294 Ill. App. 3d at 807, 690 N.E.2d at 1071-72.

     However, an insurer does not have to prove that it was prejudiced by an insured's breach of the notice clause in a policy in order to be relieved of its duty to pay.  
Twin City Fire Insurance Co. v. Old World Trading Co.
, 266 Ill. App. 3d 1, 8, 639 N.E.2d 584, 589 (1993).  Lack of prejudice to the insurer is a factor to be considered only where the insured has a good excuse for the late notice or where the delay was relatively brief.  
Old World Trading Co.
, 266 Ill. App. 3d at 8-9, 639 N.E.2d at 589; 
Fletcher v. Palos Community Consolidated School District No. 118
, 164 Ill. App. 3d 921, 518 N.E.2d 363 (1987).  In the instant case,  Ward did not present a good excuse for the late notice, nor was the delay relatively brief; therefore, prejudice to Imperial is not a factor to be considered.

III

     Ward argues that Imperial is estopped from asserting a defense of late notice.  Ward contends that it relied to its detriment on Imperial's failure to reserve rights or to inform Ward that its notice was late.  Estoppel arises through a party's voluntary conduct whereby he is precluded from asserting his rights against another who in good faith relied on such conduct and was therefore led to change his position to his detriment.  
International Insurance Co. v. Sargent & Lundy
, 242 Ill. App. 3d 614, 632, 609 N.E.2d 842, 854 (1993). 

     The estoppel doctrine applies only where an insurer has breached its duty to defend.  Thus, a court inquires whether the insurer had a duty to defend and whether it breached that duty.

Employers Insurance v. Ehlco Liquidating Trust
, 186 Ill. 2d 127, 151, 708 N.E.2d 1122, 1135 (1999).  It is the duty to defend gives rise to the duty to reserve rights when defense of a claim is undertaken, and without such a duty an insurer has no obligation to issue a reservation of rights letter.  
Sargent & Lundy
, 242 Ill. App. 3d at 633, 609 N.E.2d at 855.  An excess insurer that has no duty to investigate coverage issues or to defend its insured will not be estopped from later asserting coverage defenses by a failure to issue a reservation of rights letter.  
Sargent & Lundy
, 242 Ill. App. 3d at 632, 609 N.E.2d at 855.  However, if it is the custom to issue a reservation of rights letter between an insurer and its insured, this custom could give rise to an estoppel if it is detrimentally relied upon by the insured.  
Sargent & Lundy
, 242 Ill. App. 3d at 633, 609 N.E.2d at 855.

     Ward argues that it was Imperial's practice to issue  reservation of rights letters.  Ward refers this court to reservation of rights letters issued by Imperial to Ward in a matter concerning possible property damage at a site in Moira, NY.  On August 25, 1992, Imperial and Century, through CIGNA Property and Casualty Company, issued two letters which stated that one of the reasons for which Ward could be denied coverage was that the policyholder may have failed to provide notice to the insurance carrier as required by the policy.

     While it is true that Imperial did not issue a reservation of rights letter in response to Ward's notice letter, Ward has failed to show that it relied to its detriment on Imperial's failure to reserve it rights.  Ward simply alleges that it relied to its detriment but offers this court no proof of these allegations.  As such, there is no estoppel.

IV

     Ward argues the trial court erred when it held that Imperial had not waived its late notice defense.  A waiver consists of a voluntary, intentional relinquishment by the insurer of a known right and may be express or implied, arising from the acts, words, conduct, or knowledge of the insurer.  
State Farm Mutual Automobile Insurance Co. v. Gray
, 211 Ill. App. 3d 617, 620-21, 570 N.E.2d 472, 475 (1991).  Ward asserts that because it was not notified by Imperial of its policy defenses, the insurer has waived its defense of late notice.  We disagree.

     We find that the cases cited by the plaintiff are factually distinguishable from the case at bar and, therefore, are not controlling.  In the cases cited by the plaintiff, the insurance companies committed an act that led the insureds to believe they were covered under the policies when in actuality they were not.  Imperial committed no such act; in fact, Imperial did not respond to Ward's notice letter at all.

     It is the duty to defend that gives rise to the duty to reserve rights when defense of a claim is undertaken, and without such a duty an insurer has no obligation to issue a reservation of rights letter.  
Sargent & Lundy
, 242 Ill. App. 3d at 633, 609 N.E.2d at 855.  Here, Imperial was an excess insurer that only had a duty to indemnify, and as such, no waiver occurred.

V

     Ward contends that the mend the hold doctrine applies to this matter.  The mend the hold doctrine is a common law doctrine that limits the right of a party in a contract suit to change its position mid-litigation.  
Delaney v. Marchon, Inc.
, 254 Ill. App. 3d 933, 940, 627 N.E.2d 244, 249 (1993).  Here, Imperial did not change positions mid-litigation.  In fact, Imperial never took a position from which to change.  Ward's argument is spurious.

     For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed as to Imperial and reversed as to Century.

     Affirmed in part and reversed in part.