#22931-a-VON WALD, Circuit Judge
**2009 SD 70**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

UNION PACIFIC RAILROAD AS
SUCCESSOR-IN-INTEREST TO
THE CHICAGO AND NORTH WESTERN
RAILWAY COMPANY,                                    Plaintiff and Appellant,

      v.

CERTAIN UNDERWRITERS AT
LLOYD'S LONDON, ET. AL.,
INCLUDING CONTINENTAL
CASUALTY CO.,                                             Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JON R. ERICKSON
Judge

\* \* \* \*

ARLO D. SOMMERVOLD
Sommervold Law Firm
Sioux Falls, South Dakota

RICHARD J. GRAY
TIMOTHY M. BURNS
ZACHARY V. MOEN
Jenner & Block, LLC                                        Attorneys for plaintiff
Chicago, Illinois                                               and appellant.

CHARLES M. THOMPSON
May, Adam, Gerdes, & Thompson, LLP
Pierre, South Dakota

ALICIA J. BARTON
KEVIN M. MURPHY
Colliau Elenius Murphy Carluccio
  Keener & Morrow                                        Attorneys for defendants
Dallas, Texas                                                   and appellees.

\* \* \* \*

ARGUED
APRIL 29, 2009

OPINION FILED 8/5/09

#22931
VON WALD, Circuit Judge

[¶1.]    Union Pacific Railroad (UP) brought suit seeking recovery from its insurance carrier for the cleanup of a contaminated site located in Huron, South Dakota. Continental Insurance Company (Continental) moved for summary judgment on the grounds that the railroad did not provide timely notice of the loss and that Illinois law governed, under which to prevail the insurer is not required to show the untimely notice caused prejudice. The circuit court agreed and granted Continental summary judgment. We affirm regarding the lack of notice and conclude that a determination of which state's law applies is not necessary because the railroad is not entitled to relief under either state's law.

## FACTS AND PROCEDURE

[¶2.]    In 1910 Chicago & North Western Railway Company (C&NW) constructed a roundhouse on property it previously acquired in Huron, South Dakota. Between 1910 and 1986, C&NW used the roundhouse as a service and repair facility for locomotives. Beginning in the 1950s through 1986, C&NW also conducted refueling operations at the roundhouse.

[¶3.]    Around the same time the roundhouse was constructed, C&NW built a system for phase separation and disposal of waste generated by the roundhouse. This system consisted of three separation ponds connected to the roundhouse and to each other by underwater pipes and storm sewers. The ponds allowed oils to rise to the surface while allowing heavier sediments and contaminants to settle to the bottom.

[¶4.]    During heavy rains or when large volumes of waste water entered the ponds, the water from the waste disposal system would sometimes overflow into a

drainage ditch located on the north side of the ponds that connected to Ravine

Creek. Ravine Creek emptied into the James River near the City of Huron's

drinking water intake point.

[¶5.] C&NW obtained excess liability policies at issue in this matter from

Continental for the years of 1958 to 1961, 1961 to 1964, and 1964 to 1967. Each

policy provided coverage for losses in excess of $500,000 and contained the following

provision:

> The Insured shall give written notice to the Company of
> any loss and, as soon as practicable after the loss, the
> Insured shall render to the Company a proof of loss,
> signed and sworn by the Insured. The Insured, as often
> as may be reasonably required, shall submit to
> examinations under oath by any person named by the
> Company and shall subscribe the same; and, as often as
> may be reasonably required, shall produce for
> examination all books of account, bills, invoices and other
> vouchers, or certified copies thereof if original be lost, at
> such reasonable time and place as may be designated by
> the Company or their representatives, and shall permit
> extracts and copies thereof to be made.

[¶6.] In 1962 the waste discharges from the roundhouse were causing

problems at the City of Huron Water Treatment Plant. C&NW constructed a dike

between the area north of the roundhouse and the drainage ditch bordering the

property. It also modified plumbing of the ponds adjacent to the dike.

[¶7.] In 1986 C&NW sold the property in Huron to Dakota, Minnesota, &

Eastern Railroad Corporation (DM&E), but retained responsibility for existing

environmental contamination. In 1990 C&NW established $500,000 in

environmental reserves for the potential remediation of pollution at the Huron site.

[¶8.] On February 15, 1994, the United States Environmental Protection Agency (EPA) notified C&NW through a Notice of Potential Liability (PRP Notice) that C&NW would be held responsible for the cleanup of environmental contamination at the Huron site. The PRP Notice stated, "[i]f you are insured for any damages resulting from the release of hazardous substances, pollutants, and/or contaminants and have not already done so, we suggest that you inform your insurance carrier that EPA has spent and is considering spending additional public funds to investigate and/or control releases at the Site."

[¶9.] C&NW decided to voluntarily undertake the cleanup of the Huron site because the EPA threatened to perform the cleanup and seek reimbursement from C&NW. In 1995 UP purchased all of C&NW's assets and assumed its environmental obligations. UP entered into a cost sharing agreement with DM&E wherein UP would cover 90 percent of the costs of the investigation and cleanup. In June 1995 an Administrative Order of Consent (AOC) was sent by the EPA to UP to formalize UP's acceptance of liability for the Huron site. UP, DM&E, and the EPA negotiated the terms of the AOC and finalized it on August 28, 1996. Between 1995 and September 1997 UP entered into contracts with consultants and contractors for the cleanup of the site. In late 1997 cleanup of the site was substantially completed, with some monitoring continuing today.

[¶10.] On September 18, 1997, after substantially completing the cleanup, UP notified Continental of its liability for the Huron site. UP has stated that the timing of its notice reflected that UP and Continental and other insurers had been engaged in similar lawsuits over environmental property damage insurance

coverage in which Continental and the other insurers had refused to pay. At the time UP notified Continental of the liability over $5,000,000 had been spent remediating the site to excavate the contaminated soil, empty and treat the polluted pond water, fill in the ponds with clean soil, plant grass where the ponds formerly were, and to remove all of the plumbing from the roundhouse and between the ponds. All that remained to do was monitor the groundwater at the site.

[¶11.] On September 26, 1997, Continental responded to UP's notice with a letter informing UP that it was attempting to obtain the policies at issue here, reserving its rights under the policies, and asked for UP's help in its investigation of the claim. Continental requested:

1. Copies of any and all correspondence and documentation received from, or sent to any party or government agency relative to Union Pacific's involvement at the referenced sites.

2. Copies of any and all correspondence and documentation relative to how and when pollutants were discharged at the sites, and relative to how and when the alleged contamination transpired.

3. Copies of any and all correspondence and documentation UP believed indicated that "bodily injury" and/or "property damage," if any, transpired during the [Continental] policy periods.

4. Copies of any and all correspondence and documentation regarding any investigations and remedial measures relative to the sites.

5. Any other details or documentation that may assist [Continental] in the evaluation of these claims.

When UP failed to respond to Continental's letter, Continental sent four additional letters again requesting the information. The additional letters were sent on

November 14, 1997, February 9, 1998, August 14, 1998 and finally January 25, 1999. The letter dated January 25, 1999, was titled "Fifth and Final Request" and informed UP that if it did not respond within thirty days, Continental would assume that coverage was no longer being sought. UP failed to respond to any of the letters sent by Continental, and Continental closed the file on the claim.

[¶12.] UP brought a declaratory judgment action in the Third Judicial Circuit, Beadle County, the Honorable Jon R. Erickson presiding, to seek recovery from Continental. Continental claimed it was relieved of its obligation to provide coverage because it was not provided with timely notice. Additionally, Continental claimed Illinois law applied, which did not require the insurer to show that the late notice caused prejudice. On May 2, 2003, the circuit court granted summary judgment in favor of Continental and against UP via a letter decision. A written order was issued on May 22, 2003. UP filed an appeal of the decision to this Court on July 18, 2003. After limited remand, the circuit court issued a letter decision dated January 31, 2007, and a written order dated March 7, 2007, affirming its original decision. The circuit court held that (1) Illinois substantive law applied to the matter and governed the interpretation of Continental's insurance policies at issue and (2) Continental was relieved of its obligation to provide coverage to UP because UP failed to provide timely notice of the loss. UP filed a notice of appeal from the circuit court's decisions with this Court on April 4, 2007.

## STANDARD OF REVIEW

"In reviewing a grant of summary judgment under SDCL
15-6-56(c) we must determine whether the moving party
has demonstrated there is no genuine issue of material

fact and he is entitled to judgment as a matter of law." Rogers v. Allied Mut. Ins. Co., 520 NW2d 614, 615 (SD 1994). "Once we determine that the material facts are undisputed, our review is limited to whether the law was correctly applied." Pauley v. Simonson, 2006 SD 73, ¶7, 720 NW2d 665, 667. "We review questions of law de novo with no discretion given to the circuit court." Id.

"When interpreting insurance contracts, we have uniformly held them reviewable as a matter of law under the de novo standard." Friesz ex rel. Friesz v. Farm & City Ins. Co., 2000 SD 152, ¶5, 619 NW2d 677, 679 (citing DeSmet Ins. Co. v. Gibson, 1996 SD 102, ¶5, 552 NW2d 98, 99; Economic Aero Club, Inc. v. Avemco Ins. Co., 540 NW2d 644, 645 (SD 1995); State Farm Mut. Auto. Ins. Co. v. Vostad, 520 NW2d 273, 275 (SD 1994)). "This includes determining whether an insurance contract is ambiguous." Id. (citing Rogers, 520 NW2d at 616).

Hoglund v. Dakota Fire Ins. Co., 2007 SD 123, ¶¶ 7-8, 742 NW2d 853, 856.

## ANALYSIS

### *Notice*

[¶13.]    UP contends that it was under no duty to provide notice to Continental within a specified timeframe under the policies issued by Continental. It claims that because the provision in the policies places an "as soon as practicable" timeframe on the proof of loss requirement, but does not place a similar timeframe on the notice of loss requirement, UP could provide notice of the loss at any time. We do not agree.

[¶14.]    The provision at issue in the policies requires that UP give Continental written notice of any loss, and proof of loss as soon as practicable after the loss. To determine that the notice provision does not provide *any* type of time constraint, as UP contends, would create an absurd result. "We do not give contracts such broad

interpretations as to produce an absurd result."   Lillibridge v. Meade School Dist. #46-1, 2008 SD 17, ¶19, 746 NW2d 428, 433 (citing Kling v. Stern, 2007 SD 51 ¶8, 733 NW2d 615, 618 n3); *See also* Jerauld County v. Huron Regional Medical Center, Inc., 2004 SD 89, ¶36, n2, 685 NW2d 140, 148, n2; Nelson v. Schellpfeffer, 2003 SD 7, ¶8, 656 NW2d 740, 743.  "An absurd result is one that is 'ridiculously incongruous or unreasonable;' a result that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed upon." *Nelson*, 656 NW2d at 743 (citing American Heritage Dictionary (4th ed 2000); Beanstalk Group, Inc. v. AM General Corp., 283 F3d 856 (7th Cir 2002)).

[¶15.]       It is very unlikely that the absence of a particular timeframe for notice was intended to eliminate a timeframe altogether.  It is ridiculous and unreasonable for UP to think that Continental would allow it to provide notice whenever it determined appropriate, whether it was immediately after the loss or fifty years from the date of the loss.  The more probable scenario, and the one we find convincing, is that the parties intended for a reasonableness factor to be read into the policy regarding notice, as demonstrated by the "as soon as practicable" timeframe applied to providing proof of loss.  Notice of loss would logically come at the same time, if not before, providing proof of loss.  Any other interpretation would end in an absurd result.

[¶16.]       In addition, the absence of a time constraint on the requirement that the insured provide written notice of any loss creates an ambiguity in the policy. "Whether the language of a contract is ambiguous is . . . a question of law."  All

Star Const. Co., Inc. v. Koehn, 2007 SD 111, ¶33 741 NW2d 736, 744. Thus, the Court is required to determine how to construe the ambiguity.

[¶17.] Generally, the Court would construe ambiguities in favor of the insured. However, this is not the normal insurer-insured situation wherein conditions of the policy are dictated by the insurance company and not a negotiated agreement between insurer and insured. *See* City of Ft. Pierre v. United Fire and Cas. Co., 463 NW2d 845, 851 (SD 1990) (Sabers, J. dissenting) (citing Brakeman v. Potomac Ins. Co., 371 A2d 193, 196 (Pa 1977)). The policies at issue in this case are manuscript policies. Manuscript policies are "insurance polic[ies] containing nonstandard provisions that have been negotiated between the insurer and the insured." Black's Law Dictionary 821 (8th ed 2004). "[A] manuscript policy, . . . indicates that it was not an adhesion, preprinted contract but a policy negotiated by two equal parties on a level playing field; therefore, [the insured] is not entitled to any special protection." Koch Engineering Co., Inc. v. Gibraltar Cas. Co., Inc., 878 FSupp 1286, 1288 (EDMo 1995). Continental and C&NW were sophisticated parties on a level playing field in the negotiation of the insurance contracts. C&NW hired insurance brokers in Chicago to negotiate the terms of the policies at arms length with Continental. As a result, the terms of the policies were negotiated and agreed to by each party rather than forced upon the insured. Thus, the preference for strict enforcement against the insurance company is dispelled and, therefore, does not apply in this case. Consequently, a reasonableness standard should be applied regarding notice of loss in this case.

[¶18.] "The duty to give notice arises when, under the circumstances, the insured has reason to know of the possibility of an impending claim, regardless of whether the insured believes that he or she is liable, or that the claim is valid." 16 Williston on Contracts § 49:109 (4th ed 2000) (citations omitted). C&NW had reason to know of the impending claim when it received the PRP Notice from the EPA on February 15, 1994. The PRP Notice informed C&NW that it was a potentially responsible party and that it should notify its insurance carrier. This is perhaps the earliest point at which notice should have been given to Continental; however, C&NW did not do so.

[¶19.] Given that the policies were excess liability policies, UP may not have known that the policies would be implicated at the time the PRP Notice was sent and thus, would not have been required to provide notice until such time as the policies could be utilized.

> [E]xcess insurers . . . do not usually participate in the defense of the case and therefore do not require notice unless it appears likely that the claim will implicate the excess policy . . . the "insured must show that notice was given when it concluded that the excess insurance policy was implicated and, if the facts are not in dispute, whether the insured acted unreasonably by withholding notice to the insurer up to that point, is a question of law for the court to determine." (Hartford Accident & Indemnity Co. v. Rush-Presbyterian-St. Lukes Medical Center (1992), 231 IllApp3d 143, 150-51, 172 IllDec 641, 595 NE2d 1311, *appeal denied,* 146 Ill2d 627, 176 Ill.Dec. 798, 602 NE2d 452).

First State Ins. Co. v. Montgomery Ward & Co., Inc.*,* 642 NE2d 715, 718 (IllCtApp 1994). However, C&NW and UP failed to give Continental notice even when it was apparent that the excess policies would be implicated. In August 1995 C&NW/UP

consultants estimated the cost of the cleanup to be $2.3 to $3.5 million. This clearly would have informed C&NW/UP that there was the potential that the excess liability insurance policies would be implicated, as the policies provided coverage for losses in excess of $500,000. By March 31, 1996, UP had spent over $500,000 on the cleanup and by September 1996, UP had spent over $1,000,000 on investigation and remediation of the Huron site. At either point, UP knew that the policies would be implicated.

[¶20.] In addition, it is clear from the testimony of Robert Redick, UP's former Manager of Insurance, and through argument from its attorney, that UP had no intention of notifying Continental upon determining that the policies would be implicated. UP contends it had prior dealings with Continental in which Continental required UP to produce many documents but then did nothing until a lawsuit was filed. UP decided on its own to skip the step of providing reasonable notice. While UP may have had an unpleasant experience with Continental in the past, that did not give it the right in this case to engage in conduct that plainly ignored the mandate of the insurance contract.

[¶21.] Each case should be evaluated on its facts and circumstances to determine whether a reasonableness provision should be read into the policy and to determine whether the notice provided was reasonable. The Court is not imposing a specific timeframe in which notice should be provided nor imposing a blanket reasonableness provision for every insurance contract that fails to provide a notice term. There is no dispute between the parties regarding the facts in this case. The only dispute appears to be how the notice provision of the insurance contract should

be interpreted. Under the facts and circumstances of this case, we interpret the contract to impose a reasonableness provision into the policies issued by Continental. UP failed to give Continental written notice within a reasonable time after it determined the excess liability policies issued by Continental would be implicated. The circuit court's decision on this issue is affirmed.

*Conflict of Laws*

[¶22.]        SDCL 53-1-4 provides the choice of law regarding contracts under South Dakota law. It states: "A contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." *Id.*

[¶23.]        UP contends that the circuit court erred in applying Illinois substantive law in this case because the insurance contract was to be performed in South Dakota. Continental, on the other hand, contends that Illinois substantive law should apply because the place of performance was not indicated in the policy and because the policy was made in Illinois. However, a determination need not be made as to which law applies in this case because UP is not entitled to coverage under either state's substantive law.

[¶24.]        South Dakota law requires that an insurer show actual prejudice caused by an untimely notice and not just mere allegations of prejudice in order to prevail. Illinois law does not require the showing of prejudice. *See* Country Mut. Ins. Co. v. Livorsi Marine, Inc., 856 NE2d 338, 346 (Ill 2006); Montgomery Ward & Co., Inc. v. Home Insurance Co., 753 NE2d 999, 1005 (IllCtApp 2004). However,

based on the facts of this case Continental was actually prejudiced; therefore, the same result is achieved regardless of which state's law is applied.

[¶25.]     While prejudice generally is a question of fact, courts have held that "the issue of prejudice may become a question of law if all reasonable persons would conclude the insured did not provide notice in a reasonable time."  Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co., 325 F3d 1024, 1029 (8th Cir 2003) (citing Tresner v. State Farm Ins. Co., 913 SW2d 7, 14 (Mo 1995)).  In certain instances courts have found "summary judgment to be appropriate in several cases where the insured's breach of a notice or cooperation clause prevented the insurer from conducting a meaningful investigation of a claim or presenting a viable defense to a claim."  MacLean Townhomes, LLC v. American States Ins. Co., 156 P3d 278, 280 (WashCtApp 2007).

[¶26.]     Some courts have presumed prejudice as a matter of law.  *See* Avco Corp. v. Aetna Cas. & Sur. Co., 679 A2d 323, 329 (RI 1996) (holding insurer was prejudiced as a matter of law when at the time notice was given the insured had been aware of the contamination for two and one-half years, settled claims brought against it, entered into consent agreements with state and federal environmental protection agencies concerning remedial actions and when nothing remained for the insurer to do but pay the financial and expense commitments of the insured); Olin Corp. v. Insurance Co. of N. Am., 771 FSupp 76, 79 (SDNY 1991) (concluding presumption of prejudice was not rebutted when undisputed facts showed that at the time notice was given significant money had already been spent, consent decrees entered into, and physical appearances of the site changed); Buckeye Ranch,

Inc. v. Northfield Ins. Co., 839 NE2d 94, 110 (OhioComPl 2005) (untimely notice presumed prejudicial to insurer without evidence to the contrary).

[¶27.]     Other courts have held that a mere lack of opportunity to investigate a claim or involvement in the underlying remediation or negotiations with regulatory authorities does not amount to actual prejudice; instead, the insurer must show that its interests were actually harmed.[1]  No matter which path is followed in this case, Continental has been prejudiced.

[¶28.]     UP points to *Crum & Forster Ins. Co. v. Pacific Employers Ins. Co.*, to support its argument that the insurer must set forth specific facts or reasons to support its claim of prejudice and cannot rely on mere allegations or conclusions of prejudice.  907 FSupp 312, 315 (DSD 1995).  In that case, the United States District Court of South Dakota took the position that "failure to provide notice does not render coverage void unless the insurer can establish actual prejudice." *Id.* (citing Reliance Ins. Co. v. St. Paul Ins. Co., 239 NW2d 922, 925 (Minn 1976)).  However, the court decided the case on the grounds that wrongful termination was not within the personal injury coverage of the general liability policy.  *Id.*  The district court only discussed Pacific's claim that the failure to give prompt notice allowed it to avoid defending the insured in dictum and determined that Pacific could not avoid defending based on delay in notification because it failed to provide any specific facts or reasons for the claim of actual prejudice.  *Id.*

---

1.     Ins. Co. of the State of Pennsylvania v. Associated Int'l Ins. Co., 922 F2d 516, 524 (9th Cir 1991); Aetna Cas. & Sur. Co. v. Dow Chem. Co., 10 FSupp2d 800, 813-14 (EDMich 1998); Canron, Inc. v. Federal Ins. Co., 918 P2d 937, 943 (WashCtApp 1996); Employer's Liab. Assur. Corp., Ltd. v. Hoechst Celanese Corp., 684 NE2d 600, 608-09 (MassCtApp 1997).

[¶29.] Even if Continental were required to provide proof of actual prejudice, it articulated specific facts and reasons for the claim of actual prejudice and demonstrated that its interests were actually harmed. While UP claims that the policy provided by Continental is an indemnity policy, UP has certain duties under the policy that lead one to believe that this is not an indemnity only issue. In addition to the duty to give notice and proof of loss, there is a provision in Continental's policies which provides a right of assignment and subrogation. It provides:

> The Company may require from the Assured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by the Company and they may, at their own expense, proceed in the name of and on behalf of the Insured.

This provision imposes a duty on C&NW/UP to inform Continental of any potential loss so that Continental has the opportunity to exercise its right of assignment. In this case, C&NW/UP failed to meet its duty and therefore Continental has actually been prejudiced in its right to assignment.

[¶30.] After UP agreed to perform the remediation of the Huron site by entering into the consent agreement, it essentially stated to the EPA that it was taking responsibility for the contamination. Continental lost its ability to dispute responsibility for the contamination and to investigate to determine whether a third party, such as DM&E which owned the subject property in 1986, could have potentially been responsible for any portion of the loss. Continental has also lost any opportunity to determine if any portion of the loss resulted outside of the policy coverage periods.

[¶31.] In addition, Continental has been deprived of both an opportunity to investigate and an opportunity to be involved in the negotiations with the EPA as well as the remediation process. While perhaps the loss of one of these opportunities alone, under some circumstances, might not amount to actual prejudice, depriving an insurer of all of its opportunities to become involved created actual prejudice. UP's late notice did more than just disrupt Continental's normal procedures in investigating and handling this claim, it made portions of the investigation and handling impossible.

[¶32.] UP determined what contractor would perform the cleanup without any opportunity for Continental to give input. In fact, the entire remediation of the Huron site was completed prior to any notification to Continental. Therefore, Continental had no opportunity to determine whether the costs associated with the cleanup were appropriate prior to the cleanup being started and completed or whether the contractor hired was appropriate for the job. To determine that this was not prejudicial to Continental would give insureds the ability to hire whomever they choose, regardless of whether the cost is justified or whether the contractor hired is appropriate for the job.

[¶33.] Due to UP's failure to inform Continental of the notice from the EPA, Continental did in fact lose the opportunity to participate in the negotiations between C&NW/UP and the EPA. Continental would therefore be left to abide by whatever terms UP decided were appropriate. Again, this was highly prejudicial to Continental.

-

#22931

[¶34.] UP also argues that Continental's assertions that evidence may have been lost due to the timing of the notice are not sufficient to establish actual prejudice. While this may be true, there are more than mere assertions in this case. The cleanup of the site was completed prior to Continental being notified: the treatment ponds had been excavated, the plumbing and contaminated soil removed, the ponds filled with clean soil, and grass planted over the prior location of the ponds. Continental therefore did in fact lose the ability to obtain any evidence from the contaminated soils or from observation of the ponds in their original condition. This is more than an assertion that evidence may have been lost. Physical evidence that may have been beneficial or even crucial to Continental was destroyed, causing actual prejudice to Continental's interests. If UP had notified Continental at any time prior to completion of the site cleanup, it is possible that some of this physical evidence could have been preserved, however, UP waited to notify Continental until after the cleanup had been completed. Furthermore, the actual millions of dollars expended by UP on the project far exceeded original estimates.

[¶35.] UP contends that because Continental refused to investigate on the grounds that UP had not proven coverage, it cannot show it was prejudiced. However, UP has not shown that this would have been Continental's response had UP provided notice and proof of loss in a timely manner. It claims that Continental cannot show actual prejudice based on mere speculation but attempts to speculate here that Continental would not have investigated even if it had been notified earlier. In addition, not only did UP fail to provide proof of loss as soon as practicable as required under the policy, it is unclear from the facts presented

-

whether UP ever provided proof of loss to Continental. This prejudiced Continental's ability to make a determination as to whether an investigation was needed. Furthermore, when UP finally notified Continental of the loss, Continental asked for help from UP at five different times. This was an attempt to begin an investigation. There has been nothing presented to show that, in this case, Continental would not have attempted to investigate if it had received notice of the loss in a timely manner.

[¶36.] Finally, UP has admitted that documents from the former C&NW were destroyed during the merger. Continental is not claiming that the destruction of the documents was done intentionally to prejudice it. However, the documents were destroyed during the time C&NW/UP delayed in providing notice to Continental. Had Continental been notified of the loss when C&NW was informed by the EPA that it would be responsible for the cleanup, or at any time prior to the merger, these documents would have been available. It is unclear exactly what information these documents would have provided to Continental. Continental believes that the information might have provided some policy defenses or time frames of when things occurred. In any event, discarding pertinent information relating to a site that had potential for environmental liability is at least potentially prejudicial to the insurance company.

[¶37.] Continental has shown numerous ways in which it was actually prejudiced by the late notice. Thus, under either South Dakota or Illinois law, UP is not entitled to coverage. Therefore, it is not necessary that a determination be made regarding which state's law applies.

*Anticipatory Repudiation*

[¶38.] UP claims that it was entitled to refuse to provide Continental with timely notice of the loss because Continental had repudiated the contract by refusing to pay similar types of claims presented to Continental by UP in the past. UP is incorrect in its interpretation of when anticipatory repudiation can be utilized as a defense.

[¶39.] An anticipatory breach of a contract or anticipatory repudiation is "committed before the time when there is a present duty of performance and results from words or conduct indicating an intention to refuse performance in the future." 23 Williston on Contracts § 63:29 (4th ed 2000). "A breach of contract caused by a party's anticipatory repudiation, *i.e.*, unequivocally indicating that the party will not perform when performance is due[,] allows the nonbreaching party to treat the repudiation as an immediate breach of contract and sue for damages. This type of breach is known either as an anticipatory breach or constructive breach." Weitzel v. Sioux Valley Heart Partners, 2006 SD 45, ¶31, 714 NW2d 884, 894 (citing Restatement (Second) of Contracts §236 cmt a (1981)). "Before a repudiation by an obligor will relieve the obligee from performing conditions precedent to the obligor's performance, it must unequivocally indicate that the repudiating party intends not to honor his or her obligations under the contract." 13 Williston on Contracts §39:40 (4th ed 2000).

[¶40.] Here, UP bases its argument on previous coverage disputes in which Continental refused to pay the type of claim UP is asserting. However, there has been no evidence or overt act in this case indicating that Continental had any

intention of refusing to perform its part of the contract or that Continental ever indicated such an intention to UP at any time. Instead, it was UP which deliberately chose to refuse to perform its obligation under the contract. In fact, once Continental was notified of the loss it took steps to try to obtain the information and documentation it needed to make a determination regarding whether it would provide coverage.

[¶41.] Anticipatory repudiation applies to the contract at issue, not previous dealings. UP cannot base its refusal to provide timely notice on its prior experiences with Continental or any other insurer. UP should have provided notice to Continental in a timely manner as it was required to do and if the evidence warranted, after notice was given, then it might have been able to proceed under an anticipatory repudiation argument. UP's decision determining that Continental had repudiated the contract was premature.

[¶42.] Affirmed.

[¶43.] GILBERTSON, Chief Justice, KONENKAMP and ZINTER, Justices, concur.

[¶44.] MEIERHENRY, Justice, concurs in result.

[¶45.] VON WALD, Circuit Judge, for SABERS, Retired Justice, disqualified.

MEIERHENRY, Justice (concurring in result).

[¶46.] I concur with the conference opinion to affirm the circuit court's decision that UP failed to give Continental timely notice of its claim. As to the conflict of laws question, I would also affirm the circuit court's decision that Illinois law applies. Since Illinois law applies, this Court need not discuss or decide

whether Continental was prejudiced. According to SDCL 53-1-4, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Here, the policy created between two national companies did not indicate a place of performance. As the circuit court determined, "[t]he policy was negotiated in Illinois, signed in Illinois, delivered in Illinois, maintained in Illinois, the scope of the coverage was national, rather than confined to South Dakota, and if liability and damages are determined, payment will most likely be made in Illinois." For this reason, the law of Illinois applies rather than South Dakota law.

[¶47.]      Because Illinois law applies, we need not determine whether the insurer showed actual prejudice by the untimely notice. *See Country Mut. Ins. Co.*, 856 NE2d at 346 (no showing of prejudice required); *Montgomery Ward & Co., Inc.*, 753 NE2d at 1005 ("insurer does not have to prove that it was prejudiced by an insured's breach of the notice clause in a policy in order to be relieved of its duty to pay").