09-0753-cv
Lumbermens Mutual Casualty Company v. RGIS Inventory Specialists, LLC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2009

(Argued: November 19, 2009                     Decided:  December 9, 2010)

Docket No. 09-0753-cv

————————————

LUMBERMENS MUTUAL CASUALTY COMPANY,

*Plaintiff-Counter-Defendant-*
*Counter-Claimant-Appellant,*

—v.—

RGIS INVENTORY SPECIALISTS, LLC and ROBERT M. BIRARDI,

*Defendants-Counter-Claimants-Appellees,*

CAMRAC INC., doing business as ENTERPRISE RENT-A-CAR,

*Defendant-Counter-Claimant-*
*Counter-Defendant-Appellee.*

————————————

B e f o r e :

KEARSE, SACK, and KATZMANN, *Circuit Judges.*

————————————

Appeal from a judgment of the United States District Court for the Southern District of

New York (Baer, *J.*), dated January 22, 2009, denying plaintiff-appellant's motion for partial

summary judgment, granting defendants-appellees' motion for summary judgment, and dismissing the complaint with prejudice.  We affirm.

Judge Kearse dissents in a separate opinion.

_____

THORN ROSENTHAL, Cahill Gordon & Reindel LLP, New York, N.Y., *for Appellant.*

SANFORD N. BERLAND, Dickstein Shapiro LLP, New York, N.Y., *for Appellees RGIS and Birardi.*

PETER M. KHRINENKO, Brand Glick & Brand, P.C., Garden City, N.Y., *for Appellee Camrac.*

_____

PER CURIAM:

This appeal calls upon us to address the meaning and scope (under Michigan law) of a notice provision contained in an excess liability insurance policy issued by plaintiff-appellant Lumbermens Mutual Casualty Company ("Lumbermens"), to its insureds, defendants-appellees RGIS Inventory Specialists, LLC ("RGIS"), Robert M. Birardi ("Birardi"), and Camrac Inc. ("Camrac").  We hold that, under the specific circumstances of this case, defendants provided timely notice within the meaning of the excess liability insurance policy's notice provision, and therefore affirm the judgment of the district court.

## BACKGROUND

The instant dispute arises out of an April 2003 accident in which non-party Robert Shore was struck and injured by a minivan owned by Camrac and driven by Birardi in the course of his employment with RGIS.  Birardi was driving eastbound on an unilluminated two-lane highway

2

in Middlebury, Connecticut in the early morning hours of April 8, 2003. According to a Middlebury Police Department Incident Report, "[i]t had snowed throughout the previous evening and . . . a light drizzle of freezing rain was occurring." J.A. 1072. "The travel portion of the roadway was restricted due to ongoing snow removal operations," J.A. 1067, and Birardi was driving at between 30 and 40 miles per hour, well below the posted 45 mile per hour speed limit. After cresting a hill, Birardi's vehicle suddenly encountered Shore, who was dressed in dark clothing and — in violation of Connecticut law[1] — was walking westbound in the narrow plowed portion of the eastbound travel lane of the highway. Birardi had no opportunity to brake or avoid a collision, and his vehicle immediately struck Shore and threw him to the side of the road.

Meanwhile, a patrol car operated by Middlebury Police Officer Anthony Quicquaro was approaching from the westbound side of the highway, and observed the accident as it occurred. Officer Quicquaro called for medical assistance, and brought his vehicle around to the accident scene. On May 11, 2003, Officer Quicquaro submitted an Incident Report after completing his investigation of the accident, concluding as follows:

> Primary responsibility rested on Shore who should have been walking as far to the side of the roadway as possible. Because of the snow on the side of the roadway, the bare pavement section of the roadway was restricted to approximately 7 - 7.5 feet. With the width of the van at approximately 6 feet, there left very little room for safe passage. Shore chose to walk on the bare pavement. As a result the minivan struck Shore while the van was still operating within all legal parameters. This officer personally witnesses the collision and saw that the minivan did not have enough reaction time to perform any type of evasive maneuver.

J.A. 1074.

---

[1] Connecticut General Statute § 53-182 ("Use of highways by pedestrians") prohibits pedestrians from improperly using the travel lanes of state roadways.

All three defendants were covered by a $2 million primary liability policy issued by United States Fidelity & Guaranty Company ("USF&G"), a non-party, and a $25 million excess liability policy issued by Lumbermens ("the Excess Policy"). Birardi immediately reported the accident to his employer (defendant RGIS), RGIS immediately notified its third-party claims administrator, Gallagher Bassett Services, Inc. ("Gallagher Bassett"), and Gallagher Bassett, in turn, timely notified USF&G, the primary insurer. In the meantime, Shore's counsel sent Camrac a letter of representation. Gallagher Bassett and Discovery Managers, Ltd., the claims managing agent for USF&G, thereafter conducted an accident investigation, began negotiations with Shore's counsel, and retained an automobile-accident defense firm, Cella, Flanagan & Weber, P.C. ("the Cella firm") to assist them in evaluating the claim.

Beginning almost immediately after the accident, Gallagher Bassett and the Cella firm issued a number of reports and assessments of the Shore claim. Throughout 2003 and early 2004, Gallagher Bassett attributed 0% fault to the defendants. On April 30, 2004, Gallagher Bassett noted that "[w]e have determined liability at 0% client," assessed liability as "doubtful," but nevertheless recommended that counsel be retained "[d]ue to the nature of this claim and voluminous records received by the claimant's attorney." J.A. 558-59. On July 28, 2004, Gallagher Bassett reiterated its belief that Shore bore responsibility for the accident, but recommended increasing reserves "due to the details of accident/inj[uries]." J.A. 561-62. On August 19, 2004, the Cella firm issued a "Liability Damages Opinion Letter," estimating the full value of Shore's claim (without regard to comparative fault)[2] as being between $1.25 million and

---

[2] Connecticut has a modified contributory negligence statute, whereby a claimant who is more than 50% responsible for his injuries is not entitled to recovery. *See* Conn. Gen. Stat. § 52-572h.

4

$4 million, noting that "[i]f the claimant is found to be more than 50% at fault . . . , his comparative fault will act as a bar to recovery," and concluding that, based on the police officer's eyewitness report, "the chances of prevailing on liability issues is 90%." J.A. 566, 570. An October 29, 2004 report from Gallagher Bassett reiterated that it had "determined liability at 0% client," and noted that "[t]he likelihood of prevailing at trial is 90%." J.A. 572, 574.

On March 1, 2005, the Cella firm issued a litigation report, which (1) concluded that "[i]t is quite likely that a jury would assign in excess of 50% comparative fault to the plaintiff barring recovery on this action," (2) observed that "this matter poses significant risk given the massive injuries suffered by the claimant, his medical bills, and the future cost of care," (3) noted that "even a slight risk of plaintiff's verdict poses a substantial risk of a large award," (4) estimated the "full value" of the claim as being between $1.25 million and $4 million without regard to comparative fault; and (5) recommended filing reserves in the amount of $750,000. J.A. 580-83. A June 20, 2006 letter from the Cella firm (1) noted that the fact that the accident occurred halfway down a hill, rather than halfway up the hill as was initially thought, "negatively impacts the defense of this case," (2) estimated the "full jury value" of the case at approximately $4 million without regard to comparative fault, and (3) concluded that although it had become "apparent" that there was a less than 90% chance of prevailing on liability, there was still a "70% chance of securing a defendant's verdict," noting that Shore had "a difficult burden to overcome." J.A. 615-17. Based on the foregoing analyses, reserves for the Shore claim were never increased above $1.15 million ($1 million for liability and $150,000 for defense costs).

On February 10, 2005, Shore's representative filed suit against the defendants, and in May 2005, Shore's damages expert valued the claim at $3.7 million. The parties participated in

5

a mediation in June 2007. In its pre-mediation report, the Cella firm noted that it continued to "believe [it had] a strong chance of securing a defense verdict on the comparative fault special defense." J.A. 219 (noting that "this case presents the rare situation where the chance of a defense verdict outweighs the chance of a plaintiff verdict"). The report nevertheless noted, however, that the most likely scenario "*should a jury return a plaintiff's verdict*, presently consists of the 50% comparative fault threshold, which would permit the plaintiff to recover" between $1.5 million and $3.5 million. *Id.* (emphasis added). At the June mediation, Shore's counsel stated that he was confident that the jury would return a verdict for Shore, and estimated only a 20 to 25% reduction in damages for comparative fault. Shore's counsel's initial settlement demand was $9.5 million, which he lowered to $7.5 million, while defense counsel made two settlement offers: $50,000 and $100,000. Settlement discussions continued through January 2008, but ultimately were unsuccessful.

On January 14, 2008 (nearly five years after the accident and on the eve of trial), RGIS (through its primary insurer and Gallagher Bassett) notified Lumbermens of the Shore action. Lumbermens issued a reservation of rights letter that same day, contending that the insureds had violated the Excess Policy's notice condition, and observing that the Excess Policy "confers no obligation on [Lumbermens] to respond to this matter until such time as all underlying limits are properly exhausted." J.A. 1040. Lumbermens thereafter issued a notice of disclaimer, contending that it had not received timely notice of the claim, and refusing to indemnify the insureds or provide them with a defense.

Meanwhile, the Shore action proceeded to trial. On January 30, 2008, the jury returned a verdict for Shore, allocating 100% of liability to the insureds, and on February 13, 2008, the jury

6

awarded approximately $11 million in damages.

Lumbermens commenced the instant action on February 6, 2008, seeking a declaratory judgment to the effect that defendants are not entitled to coverage under the Excess Policy for the Shore claim because of defendants' untimely notice. As noted, the Lumbermens $25 million policy is excess over the $2 million primary USF&G policy. The Excess Policy provides, in part, that:

> We will pay only the amount in excess of the sums actually payable under the terms of the "underlying insurance." No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for . . . . In the event the duty of the underlying insurer to defend the insured against a "suit" ceases solely because the applicable limit of insurance is used up in the payment of judgments or settlements, then we shall assume the duty for such defense.

J.A. 834. The primary policy, by contrast, acknowledges the primary insurer's "right, duty, and ultimate authority to investigate, defend or settle any claim or 'suit' asking for damages." J.A. 818.

The Excess Policy requires notice of "an 'occurrence' or an offense *whenever it appears likely it will result in a claim involving*" *excess coverage*, and notice of a claim or suit "*whenever it appears likely that such claim or 'suit' will involve*" *excess coverage*. J.A. 845 (emphases added). The Excess Policy also requires copies of demands, notices, summonses, or legal papers received "in connection" to a claim or "suit" to be furnished only "whenever it appears likely that the claim will involve" excess coverage or where Lumbermens has "assumed the duty to defend" the insured. *Id.* The USF&G primary policy, by contrast, requires notice "*as soon as possible*" of (1) "an accident which may result in a claim or 'suit' seeking a total amount of damages . . . in excess of the self-funded retention," (2) "each claim or 'suit' which involves serious injury(ies) or damage(s)"; and (3) "each claim or 'suit' which has, should have, or is

7

likely to have, without regard to liability, a reserve equal to or exceeding thirty-three and one third percent (33 1/3 %) of the self-funded retention." J.A. 821-22 (emphasis added).

After the instant action was filed, the parties cross-moved for summary judgment. On January 21, 2009, the district court granted summary judgment for defendants and denied summary judgment for Lumbermens, finding that, under Michigan law,[3] defendants "provided timely notice within the meaning of the Excess Policy." District Court Opinion at 10. In so concluding, the court observed that "[e]very professional who investigated the accident on behalf of RGIS and Birardi found that any finding of liability against the Defendants was unlikely, *i.e.*, less than 50%, and that the claim should be fully resolved well within the limits of the Primary Policy." *Id.* at 9. As a result, the court found that defendants "believed that they would likely be held not liable, or, if they were **held liable**, that they would be liable for only a small amount of damages, due to Connecticut's comparative fault statute." *Id.* (emphasis in original). The court thus concluded that defendants had no obligation to notify Lumbermens until "the accident, claim or suit appeared probable, or more likely than not, to exceed more than $2 million." *Id.* at 8. The court also rejected Lumbermens' claims of prejudice as unsupported and speculative. *Id.* at 11.

The district court entered final judgment on January 22, 2009, and the instant appeal followed. Meanwhile, in the Shore action, defendants filed a notice of appeal to the Connecticut state appellate court. The parties in that action participated in formal mediation, and, while the instant appeal was pending, Shore accepted an offer to settle the case for $6 million. By summary order dated December 11, 2009, this panel dismissed Lumbermens' appeal, vacated the

---

[3] None of the parties here challenges the district court's decision to interpret the Excess Policy under Michigan law.

8

district court's judgment, and remanded the case to the district court with instructions to consider whether that settlement rendered this declaratory judgment action moot. *See Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 356 Fed. App'x 452, 455 (2d Cir. 2009) (summary order). The district court, in turn, determined that this action is not moot, reinstated its original opinion granting defendants' motion for summary judgment, and dismissed Lumbermens' complaint. *See Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, No. 08 Civ. 1316, 2010 WL 2017272 (S.D.N.Y. May 20, 2010). Lumbermens promptly restored jurisdiction to this Court by letter dated May 20, 2010. With our jurisdiction restored, we now turn to the merits of Lumbermens' claim.

## DISCUSSION

We review the grant of summary judgment *de novo*, "examining the evidence in the light most favorable to, and drawing all inferences in favor of, the non-movant." *Sheppard v. Beerman*, 317 F.3d 351, 354 (2d Cir. 2003). In so doing, we "utilize[] the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). Where, as here, there are cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

The central question presented here is whether defendants provided timely notice of the Shore claim as required by the Excess Policy's notice provision. The answer to that question turns on the language of the notice provision itself and the reasonableness of defendants' belief

9

that it was highly unlikely that the primary insurance policy limits would be exhausted. For the following reasons, we are satisfied that defendants' notice was timely, and thus see no error in the district court's grant of summary judgment dismissing Lumbermens' action.

Under Michigan law, we "give the language contained within [an insurance] policy its ordinary and plain meaning so that technical and strained constructions are avoided." *Amway Distribs. Benefits Ass'n. v. Northfield Ins. Co.*, 323 F.3d 386, 392 (6th Cir. 2003) (citation omitted). We are required to "enforce the contract as written if it fairly allows but one interpretation," *Morley v. Auto. Club of Michigan*, 581 N.W.2d 237, 240 (Mich. 1998), and our ultimate goal is to enforce the agreement intended by the parties. *See Engle v. Zurich-American Ins. Grp.*, 583 N.W.2d 484, 485 (Mich. Ct. App. 1998). Here, as noted, the Excess Policy requires notice of "an 'occurrence' or an offense whenever it appears likely it will result in a claim involving" excess coverage, and notice of a claim or suit "whenever it appears likely that such claim or 'suit' will involve" excess coverage. J.A. 845. Such language, on its face, does not require notice of all claims for amounts that exceed the primary policy's limits of $2 million. Rather, the notice provision plainly refers to the likelihood of the Excess Policy actually being implicated through liability once the primary coverage is exhausted. *See Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 10 F. Supp. 2d 800, 807, 829 (E.D. Mich. 1998); *see also Sudul v. Coregis Ins. Co.*, No. 214715, 2001 WL 633698, at *4 (Mich. App. May 25, 2001) (treating similar language as referring to the likelihood of a policy being implicated through liability "once the limits of all underlying insurance were exhausted"). In *Aetna*, as the dissent notes, the court interpreted a notice provision similar to the one in issue here to require the insured "to give notice when 'it has information from which the Assured may reasonably conclude that an

10

occurrence covered hereunder involves injuries or damages, which, in the event that the Assured should be held liable, is likely to involve this Policy,'" 10 F. Supp. 2d at 807 (original emphases omitted), but the court also concluded that an occurrence would be "likely to involve" the excess policy only in those instances where the insured reasonably concluded that the primary policy would be exhausted, *id.* at 829.

The Excess Policy further limits the insured's notification duties to those specific circumstances in which it "appears likely" that a claim "will" involve the Excess Policy. Thus, on its face, the Excess Policy does not require notice to be given when it appears "possible" that a claim "may" or "might" involve the Excess Policy; nor does the policy require notice whenever a claim involves serious injuries or high monetary demands. Indeed, the Excess Policy's language in this respect stands in stark contrast to the notice provision contained in the primary policy, which requires notice — without regard to liability — of all claims that "involve[] serious injury(ies) or damage(s)" or exceed a certain threshold amount.[4] J.A. 821-822. Moreover, unlike certain other notice provisions previously interpreted under Michigan law, the notice provision here does not require notice whenever an insured "has information from which [it] may reasonably conclude" that a policy would be implicated "in the event [the insured] should be held liable." *Assoc. Indemnity Corp. v. Dow Chem. Co.*, 248 F. Supp. 2d 629, 645, 647 (E.D. Mich. 2003) (interpreting such language to require notice "when

_____

[4] The difference between the policies' respective notice provisions reflects the general distinction between primary and excess insurance policies. "Since excess coverage is contingent on exhaustion of primary or underlying policies, excess insurers generally do not require notification of occurrences until the excess policy is reasonably likely to be implicated. Consequently, insurance policies for excess coverage grant the insured some discretion in evaluating the case." *Santos v. Farmers Ins. Exch.*, No. 07-11229, 2008 U.S. Dist. LEXIS 13238, at *11-12 (E.D. Mich. Feb. 22, 2008) (applying Michigan law).

11

[the insured] had information before it from which it *may* — in the sense of 'could' — reasonably conclude that it is likely to involve its insurers").

Lumbermens could have used any of these formulations when drafting the Excess Policy's notice provision, but chose not to do so. Instead, as noted, the policy only requires notice when it "appears likely" that a claim "will" involve excess coverage. Thus, under the express terms of the Excess Policy's notice provision, defendants were required to provide notice to Lumbermens only when a claim or occurrence appeared probable — as in more likely than not — to exceed the primary policy's $2 million limits. *See Black's Law Dictionary* 925 (6th ed. 1991) (defining "likely" to mean "of such nature or so circumstantial as to make something probable and having better chance of existing or occurring than not"); *Moll v. Abbott Labs.*, 506 N.W.2d 816, 827 (Mich. 1993) (same).

In light of these express terms, we find no error in the district court's conclusion that, as a matter of law, defendants provided timely notice of the Shore claim to Lumbermens within the meaning of the Excess Policy. The undisputed evidence shows that, upon receiving timely notice of the Shore claim, defendants' primary insurer and third-party claims administrator conducted an investigation and retained outside counsel to assist with assessing and defending the claim. The third-party claims administrator and defense counsel thereafter repeatedly evaluated defendants' potential exposure, and issued a number of reports and assessments of the underlying claim, each of which emphasized that Shore bore primary responsibility for the accident. Reserves for the underlying claim were never raised above $1 million for losses (well within the primary policy's limits), and at no point prior to trial did anyone (other than plaintiff's counsel) indicate that a finding of liability was "likely" or "more probable than not." To the

12

contrary, the claims administrator and defense counsel repeatedly emphasized that, *at the very most*, Shore had a 30% chance of prevailing, and that even if Shore prevailed, any recovery would be tempered by Connecticut's modified comparative fault statute. In the face of such repeated, consistent, and unequivocal assessments — all of which directly bear on whether it appeared "likely" that Shore's claim would reach the Excess policy — we find no error in the district court's grant of summary judgment in defendants' favor.

Lumbermens argues that, at the very least, questions of fact remain as to the reasonableness of defendants' reliance on the advice that it received regarding the underlying claim. Lumbermens has failed, however, to point to any evidence that calls into question the reasonableness of such advice, and no evidence indicates that defendants ever subjectively believed that it appeared "likely" that the Excess Policy would be implicated. Indeed, the record indicates that the advice that defendants received, which consistently indicated that the claim was unlikely to involve the Excess Policy, was tempered by and took into account the concerns that Lumbermens raised. Although Lumbermens makes much of the fact that it was immediately apparent that Shore suffered serious injuries from the accident, such an approach "oversimplif[ies] the issue of [defendants'] notice requirement," *Aetna Cas. & Sur.*, 10 F. Supp. 2d at 829, particularly given that our assessment of whether defendants' notice was untimely under that provision necessarily turns on the strength of Shore's negligence claim, not on the nature or extent of Shore's injuries. Under such circumstances, and in light of the fact that insurers cannot "us[e] hindsight to support a late notice defense," *Aetna Cas. & Sur.*, 10 F. Supp. 2d at 809, it was objectively reasonable for defendants to rely on the advice that they received indicating that the underlying claim was not likely to trigger the Excess Policy.

13

In short, we are satisfied that defendants' notice was timely, and see no error in the district court's grant of summary judgment dismissing Lumbermens' action. For that reason, we need not address the district court's alternative ruling that Lumbermens failed to show actual and material prejudice.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

Lumbermens
Mutual
Casualty Co.
v. RGIS
Inventory
Specialists,
LLC, No.
09-0753-cv

KEARSE, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision to affirm the district court's grant of summary judgment dismissing this action brought by plaintiff Lumbermens Mutual Casualty Company ("Lumbermens") seeking a declaratory judgment that defendants RGIS Inventory Specialists, LLC., et al. (collectively "RGIS"), were not entitled to coverage under their excess insurance policy with Lumbermens for "Commercial Catastrophe Liability Coverage" (the "Policy"), which was to provide up to $25 million coverage if the $2 million coverage provided in RGIS's primary insurance policy were exhausted. Lumbermens contended that with respect to an April 8, 2003 catastrophic traffic accident--in which a vehicle driven by an RGIS employee struck pedestrian Robert Shore, leaving Shore brain damaged and unable to walk, talk, or use the right side of his body--and a February 10, 2005 lawsuit on behalf of Shore based on that accident, RGIS's notice to Lumbermens on January 14, 2008 was not timely. I have several difficulties with the majority's analysis of the relevant Policy provisions and its conclusion that RGIS's notice, given nearly five years after the accident and literally on the eve of trial, was timely.

The Policy, which made timely notice a precondition to Lumbermens's duty to provide RGIS with excess coverage, provided, in pertinent part, as follows:

a. You must see to it that we are <u>notified as soon as practicable</u> of an "occurrence" . . . whenever it appears likely it will result in <u>a claim involving</u> this Coverage Part . . . .

    . . . .

Notice of an "occurrence" . . . is not notice of a claim.

b. <u>If a claim is made or "suit" is brought against any insured, you must</u>

    . . . .

    2) <u>Notify us as soon as practicable</u>.

You must see to it that we receive written notice of the claim or "suit" <u>as soon as practicable whenever it appears likely that such claim or "suit" will involve this Coverage Part</u>.

(Emphases added.) The Policy also provided that RGIS "must . . . [c]ooperate with [Lumbermens] and with the underlying insurer in the investigation or settlement of any [such] claim."

The majority holds that these terms did not require RGIS to notify Lumbermens of the accident because RGIS believed--based principally on (a) the opinions of the police officer who had witnessed the accident that RGIS's driver had been driving safely and was not negligent, and (b) Connecticut principles of comparative negligence--that it would not be found liable for Shore's injuries. The majority reaches its conclusion principally by emphasizing the word "will," stating that "the policy only requires notice when it 'appears likely' that a claim 'will' involve excess coverage," Majority Opinion <u>ante</u> at 12, and stating

- 2 -

that "at no point prior to trial did anyone (other than [Shore's] counsel) indicate that a finding of liability was 'likely' or 'more probable than not,'" id. at 13 (emphasis added); see also id. (stating that RGIS's belief that it would "prevail[]" "directly b[ore] on whether it appeared 'likely' that Shore's claim would reach the Excess policy" (emphases added)).

In my view, the majority's rationale both ignores the normal breadth of the word "involve[s]" and confuses the concepts of claim and liability. The Policy does not say that notice is to be given when it appears likely that the insured will be 'liable' for an amount involving the excess coverage. Rather, it requires notice when it appears likely that an occurrence "will result in a claim involving" the excess coverage, and requires notice when a claim is made or a suit is brought and it appears likely that "such claim or 'suit' will involve" the excess coverage (emphases added). In my view, where the claimed damages "do not appear grossly inflated," Kerr v. Illinois Central R.R. Co., 283 Ill. App. 3d 574, 584, 670 N.E.2d 759, 767 (1996) ("Kerr") (applying Illinois law); see Royal Property Group, LLC v. Prime Insurance Syndicate, Inc., 267 Mich. App. 708, 714 n.5, 706 N.W.2d 426, 432 n.5 (2005) ("Illinois rules of insurance policy interpretation are substantially similar to those of Michigan"), a claim or a suit seeking more than $2 million "involve[s]" more than $2 million.

The majority points out that the "whenever it appears likely" language confers on the insured "some discretion" in evaluating the case, see Majority Opinion ante at 12 n.4. I agree, although to me that cannot be the end of the analysis.

- 3 -

See _Aetna Casualty & Surety Co. v. Dow Chemical Co._, 10 F.Supp.2d 800, 809 (E.D. Mich. 1998) ("_Aetna_") (a requirement for notice when the insured "'had information or had formed an opinion at a particular time that a claim would implicate' the policy" is "rubbery language . . . designed to give the insured _some_ leeway or discretion in forming a judgment about when . . . protection is implicated" (quoting policy language; other internal quotation marks omitted) (emphasis added)). Plainly, "some" discretion does not mean total or unfettered discretion.

> [W]hen the timeliness of the notice is challenged by an excess insurer and a court is asked to consider whether an insured has complied with the notice provision in an excess policy which leaves the timing of the notice up to the discretion of the insured, the court must determine whether the insured abused the discretion granted to it by the insurer, i.e., whether the insured acted unreasonably under the circumstances.

_Kerr_, 283 Ill. App. 3d at 580, 670 N.E.2d at 764 (emphasis added) (internal quotation marks omitted) (considering a provision requiring notice when it "appears that an occurrence is likely to involve indemnity") (emphasis in original). "Although . . . some consideration must be given to the insured's investigation and evaluation of the case in light of the discretion granted the insured by its excess insurer," the court should "not . . . consider the insured's evaluation of the case to the exclusion of all else," rather than "in light of all the circumstances." _Id._ at 581, 670 N.E.2d at 764-65 (emphasis added). "An insured cannot simply roll the dice with the insurer's funds, hiding behind the statistical probabilities it has assigned to the case outcome." _Id._ at 586, 670 N.E.2d at 768.

- 4 -

I do not read the cases applying Michigan law and interpreting notice clauses similar to those at issue here to indicate that whether a claim or a suit "involve[s]," or "implicate[s]," an excess insurance policy depends upon whether or not the insured believes it will ultimately be found liable. In Aetna, for example, the court considered an excess policy that required the insured to "give notice when it has 'knowledge of any occurrence likely to give rise to a claim hereunder,'" 10 F.Supp.2d at 807, language that the court found "substantially similar" to policy language requiring the insured "to give notice when it 'has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable, is likely to involve this Policy.'" Id. (emphasis added; original emphases omitted). Some focus must be on the magnitude of the claim; the focus cannot reasonably be solely on the likelihood of a finding of liability. "'Excess insurers are not interested in every accident,'" but they are interested "'in those that may be serious enough to involve [them].'" Santos v. Farmers Insurance Exchange, No. 07-11229, 2008 WL 506351, at *4 (E.D. Mich. 2008) (applying Michigan law; quoting Tribune Co. v. Allstate Ins. Co., 306 Ill. App. 3d 779, 790, 715 N.E.2d 263, 271-72 (1999), which was applying Illinois law).

In this case, it was plain from the outset that the accident was serious enough to result in a claim of more than $2 million, the limit of RGIS's primary insurance. The police report of the accident noted that Shore had sustained two broken legs,

- 5 -

possible internal injuries, and possible brain damage. Shore's complaint, filed in February 2005, alleged that Shore had suffered "serious and painful injuries, some of which may be permanent," including "injuries to his neck," "injuries to his back," and "severe and massive head trauma resulting in a comatose state and prolonged unconsciousness." The law firm retained to defend Shore's lawsuit ("Cella") prepared a litigation report for RGIS in May 2007 (the "Cella report") which noted that Shore's economic-injury expert "estimate[d] Mr. Shore's total life care cost at an estimated $3,706,132.00" and that although RGIS had not retained an expert, Cella was "certain that any life care plan will provide estimates in the millions of dollars range." Moreover, noting that Shore "cannot walk or talk any longer," that "[h]e requires constant care for all [activities of daily life]," that "his loss of life's enjoyment is significant," and that "a jury will consider how painful the actual incident was, as well as the pain of rehabilitation and his current disability," the Cella report "estimate[d] that Mr. Shore's non-economic damages [we]re at least equal to his economic damages in terms of settlement and jury value." (Emphasis added.) Thus, Shore's damages as estimated by the Cella report totaled more than $7,400,000. Even if Shore were found as much as 50% responsible for the accident, he would be entitled to recover more than $3,700,000--i.e., nearly twice the coverage provided by RGIS's primary insurer. The Cella report concluded that, "given the risk, no matter how slight, of a substantial damages award, there is considerable value to settling this claim short of trial."

- 6 -

At the ensuing mediation session in June 2007, the Cella report's damages estimate proved not far off. Shore's attorneys initially demanded $9.5 million, and by the end of the session had lowered their demand to $7.5 million. On the following day, RGIS was informed by one of its advisors who had attended the session that he thought the case could be settled for "$4M-$5M." There was no settlement, however. The insureds and their primary carrier never offered Shore more than $100,000. At the trial, which commenced on January 15, 2008, one day after RGIS finally notified Lumbermens of the suit, the jury found RGIS 100% responsible and awarded Shore more than $11.1 million.

Despite the pretrial predictions of RGIS's advisors that RGIS would not ultimately be found liable, there had been observations in the Cella report that suggested a more cautious assessment. For example, although the predictions drew heavily on the opinion of Police Officer Quicquaro, who had witnessed the accident and believed that RGIS's driver was not at fault, the Cella report stated that "many of the conclusions and opinions that Officer Quicquaro reached will not likely be admissible at trial" because Cella did "not believe Officer Quicquaro will be qualified as an expert witness and because many of the conclusions reached by Officer Quicquaro are the ultimate issues that will be before the jury." Further, although the RGIS employee who was involved in the accident had testified in his deposition that he was traveling no faster than 30 miles per hour when he struck Shore, the Cella report noted that

> there are several entries in the plaintiff's medical
> records that the car, which struck Mr. Shore, was

- 7 -

> traveling at, or about, 40 miles per hour. . . . The records also indicate at several locations that the plaintiff was thrown some 40 to 50 feet upon impact.

While the Cella report indicated the belief that those records would not be admissible in Shore's case-in-chief, it stated that "they may come into evidence on cross examination to undermine Officer Quicquaro on his estimate that the defendant was driving reasonably." In addition, RGIS's driver had told the police he had no time to react to the appearance of Shore; but according to the Cella report, the accident occurred halfway down a hill. And at whatever speed the RGIS driver was actually traveling, it seems clear that he did not apply his brakes before striking Shore, as the Cella report noted that "there [we]re no skid marks."

These are not just factors that should be considered in determining whether RGIS abused its discretion in declining to give Lumbermens notice of Shore's claim; they also are pertinent to whether Lumbermens was prejudiced by RGIS's failure to give it notice in time to assess the litigation risk and participate in the settlement discussions. Although the majority views it as unnecessary to address the question of whether Lumbermens was prejudiced by the lack of notice, "prejudice to the rights of the insurer is a necessary element to be considered in determining whether there has been an unreasonable delay in giving notice of an accident to the insurer 'as soon as practicable.'" Weller v. Cummins, 330 Mich. 286, 292-93, 47 N.W.2d 612, 615 (1951); see, e.g., Wehner v. Foster, 331 Mich. 113, 117, 49 N.W.2d 87, 89 (1951) (same); Sudul v. Coregis Insurance Co., No. 214715, 2001 WL 633698, at *4 (Mich. App. 2001) (considering whether an excess

insurer was prejudiced before concluding that it had "received the requisite notice"); Kerr, 283 Ill. App. 3d at 584, 670 N.E.2d at 767 ("Prejudice to the insurer is a factor to consider in determining the reasonableness of notice.").

The district court rejected as "speculati[ve]" the contention that the delayed notice prejudiced Lumbermens by depriving it of the opportunity to participate in the settlement discussions. It is clear, however, that there were settlement negotiations from which Lumbermens was excluded. It is also clear that the Policy required RGIS to cooperate with Lumbermens and the primary insurer in "settlement of any claim," that the Cella report had recommended settling Shore's claim rather than going to trial, and that after the mediation session an advisor opined to RGIS that the matter might be settled for as little as $4 million. As RGIS's primary policy ceiling was $2 million, and Shore's damages were estimated even by RGIS's attorneys as exceeding $7,400,000, Lumbermens surely would have had an incentive to attempt to secure a settlement. A "late notice [that] prevented the insurers from participating in settlement negotiations" may constitute prejudice, Associated Indemnity Corp. v. Dow Chemical Co., 248 F.Supp.2d 629, 650-51 (E.D. Mich. 2003) (granting summary judgment to the excess insurer on the basis of untimely notice), and in the circumstances of the present case, I do not see how Lumbermens's claim of prejudice can properly be rejected as a matter of law.

The majority opinion, in disagreeing with this dissent, notes that the Aetna court, dealing with a policy requirement for

- 9 -

notice of any claim that was likely to involve the policy "'in the event that the Assured should be held liable,'" Aetna, 10 F.Supp.2d at 807, "concluded that an occurrence would be 'likely to involve' the excess policy only in those instances where the insured reasonably concluded that the primary policy would be exhausted." Majority Opinion ante at 11. I have two responses. First, the policy clause "'in the event that the Assured should be held liable'" (emphasis mine), focuses the notice requirement principally on the amount of the claim and not on the likelihood of a finding of liability; that clause is not the equivalent of a condition that the insured be likely to be held liable. Second, whatever the focus of that clause, it is clear that, unlike the district court here, the Aetna court did not grant summary judgment--or any other form of judgment as a matter of law--against the insurers.

For the above reasons, I would vacate the judgment of the district court and remand the matter for trial.